## Schlichter et al. *v.* Keiter et al., Appellants.

[Marked to be reported.]

*Church law—Constitution—Confession of faith—Alteration.*

Under the constitution of the " Church of the United Brethren in Christ," adopted in 1841, providing that " no rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands, nor to destroy the itinerant plan," the confession of faith is not absolutely unchangeable in its manner of expressing the doctrines of the church, but it can be changed in the interest of clearness of expression or fulness of statement of the accepted doctrines of the church.

*Alteration of constitution—Election—Title to property.*

The constitution of the United Brethren in Christ provided that: " There shall be no alteration of the foregoing constitution unless by the request of two thirds of the whole society." The general conference of the church formulated certain changes in the constitution, and submitted them to the members of the church generally, who numbered about 200,000 persons. Of this number 51,070 signified their desire for the proposed changes by an affirmative vote. Those voting against the changes were 3310. Those who preferred another mode of proceeding than that which had been taken, and petitioned a general conference accordingly, were 16,187. The total number of those who expressed themselves upon the subject was 70,567. The general conference, assuming that the consent of the church had been obtained, adopted the new constitution by a large majority, and promulgated it as the law of the church. A small minority withdrew and organized another conference. Defendants, who were adherents of the minority, took possession of a certain church and refused to surrender it to the majority of the congregation who adhered to the general conference which had adopted the new constitution. *Held,* (1) that a majority of the whole number of persons voting was sufficient to adopt the new constitution, and that it must be assumed that those who did not vote were either favorable or indifferent to the proposed changes; (2) that the "request" of two thirds of the whole society had been sufficiently manifested in favor of the proposed change; (3) that the persons who withdrew from the conference were an ecclesiastically distinct body, and had no title to the property owned by the church prior to their withdrawal from it.

Argued March 6, 1893. Appeal, No. 193, Jan. T., 1892, by defendants, M. F. Keiter et al., from decree of C. P. Franklin Co., Dec. T., 1889, No. 1, on bill in equity, in favor of plaintiffs, H. A. Schlichter, Presiding Elder of the Chambersburg District of the Church of the United Brethren in Christ; Theophilus Wagner, Preacher in Charge and Superintendent of

the Sunday School; Henry Strealy, Class Leader, and J. F. Fisher, J. N. Sheeley, J. F. Wilt, C. R. Hoover, Simon Burns, E. Bovey and J. Hellane, Trustees of the Church of the United Brethren in Christ at Greencastle, Pa. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and THOMPSON, JJ.

Bill in equity to restrain defendants from any interference with the services or church property of " The United Brethren in Christ," at Greencastle, Pa.

The bill alleged that H. A. Schlichter was the presiding elder of the Chambersburg district of the Church of the United Brethren in Christ, of which district the Greencastle circuit forms a part; that Theophilus Wagner was the preacher in charge of said church at Greencastle, duly and regularly assigned, and the duly appointed superintendent of the Sunday school; that Henry Strealy was the duly and legally elected class leader of said church, and the said J. F. Fisher, J. N. Sheeley, J. F. Wilt, C. R. Hoover, Simon Burns, E. Bovey and J. Hellane the trustees of said church.

It then set forth the action of the general conference of the Church of the United Brethren in Christ held in 1885, looking to an amendment of the constitution and a revision of the confession of faith of the church; the action of the general conference of 1889 and of the board of bishops in relation to the amended constitution and revised confession.

That after proclamation had been made by a majority of the board of bishops declaring said amended constitution and revised confession of faith to be the constitution and confession of faith of the church, a minority of the bishops and delegates to said conference withdrew therefrom and proceeded to organize another conference, claiming that they were and are the only true Church of the United Brethren in Christ.

That, M. F. Keiter, one of the defendants, claiming his authority from said seceding body, was undertaking to exercise the office of presiding elder of the said Chambersburg district of the Church of the United Brethren in Christ; that Peter Nicklas, another of said defendants, claiming authority from the same body, was undertaking to exercise the office of preacher in charge of the said Greencastle circuit; that the

other defendants were claiming to exercise the offices, respectively, of trustees of the church at Greencastle, class leader and Sunday school superintendent; and that the defendants were hindering and obstructing the plaintiffs in the exercise of their said offices.

The prayers of the bill are that the defendants be restrained and enjoined from such interference and from exercising the said offices which they respectively claim as aforesaid; and for other relief.

The defendants in their answer alleged that the amended constitution and revised confession of faith as adopted by that portion of the general conference of 1889 to which the plaintiffs adhere were radically different from the old; that the attempted change of the constitution was not made in conformity with the method therein provided; and that said amended constitution is therefore void and of no effect; that the confession of faith cannot be changed at all so long as the constitution remains unchanged; and that the action of the general conference of 1889 was therefore revolutionary, and that the people of the church were not bound to render obedience thereto.

The cross bill set forth that the said M. F. Keiter is the presiding elder of the Chambersburg district of the Church of the United Brethren in Christ, duly and regularly appointed, of which district the Greencastle circuit forms a part; that said Peter Nicklas is the regularly assigned preacher in charge of the said United Brethren Church at Greencastle; that Peter G. Strine is the legally elected class leader and superintendent of the Sunday school of said church; and that the said Peter G. Strine, Adam Bear, Sr., Adam Bear, Jr., Samuel Crist, David Smith, F. W. Barnhart, and Frank Yates, the other defendants, are the legally elected trustees of said church; that the plaintiffs, above named, claiming the right to exercise the aforesaid offices respectively, are hindering, obstructing and interfering with them (the complainants in the cross bill) in the exercise and discharge of the duties of their said respective offices; and prayed that they, the said H. A. Schlichter and others, be enjoined and restrained from such interference.

The case was referred to W. U. Brewer, W. K. Sharp and H. J. Plough, Esqs., as masters, who found the facts as stated in the opinion of the Supreme Court. They further reported

that " the revised confession of faith contains no doctrine that was not taught in the church prior to its adoption, unless it be the doctrine of sanctification, and with respect to this doctrine the church seems to have no well defined belief." The masters reported a decree in favor of plaintiffs.

Exceptions to the master's report were overruled in an opinion in part as follows, by STEWART, P. J.:

" [The interpretation of the constitutional provision was a proper subject for the judicial action of the general conference. If susceptible of different constructions, it had the right to say what it meant—whether two thirds of all the members of the society, or two thirds of those voting at the election; and, acting strictly within its powers, it did decide that it meant two thirds of those voting. From that decision no appeal lies; for there is no higher tribunal within the church, and we cannot rejudge its decrees.] [2] The law upon this subject is aptly and concisely expressed in Watson v. Jones, 13 Wall. 679: 'The right to organize voluntary religious associations to assist in the expression and dissemination of any religious doctrine, and to create tribunals for the decision of controverted questions of faith within the association, and for the ecclesiastical government of all the individual numbers, congregations, and officers within the general association, is unquestioned. All who unite themselves to such a body, do so with an implied consent to this government, and are bound to submit to it. But it would be a vain consent, and would lead to the total subversion of such religious bodies, if anyone aggrieved by one of their decisions could appeal to the secular courts, and have them reversed. It is of the essence of these religious unions, and of their right to establish tribunals for the decision of questions arising among themselves, that those decisions should be binding in all cases of ecclesiastical cognizance, subject only to such appeals as the organism itself provides for.'

" This same doctrine has repeatedly been held by our own Supreme Court. Indeed, it has long since passed beyond discussion into the settled law of the land. It is sufficient to refer to the cases of Ger. Ref. Church v. Seibert, 3 Pa. 291, and McGinnis v. Watson, 41 Pa. 10, without quoting therefrom. . . .

" It seems to have been mistakenly assumed by the general conference, that the provision in the constitution for a change

of that instrument applied as well to the confession of faith, and the same procedure was resorted to in making the change. The confession of faith is no part of the constitution, and the latter makes no provision for the change of the former; it simply forbids the general conference to pass any rule or ordinance changing or abolishing it. With this limitation upon the power of the general conference, a change was impossible under that constitution. To effect a change by constitutional methods, regular procedure would have first required a change in the constitution itself. The mistake that was made is obvious; but whatever effect it may have upon the authority and binding force of the new confession,—upon which we express no opinion,—we cannot allow it the significance in this contention which defendants' counsel claim for it. [It can serve no purpose here to inquire into the regularity of the procedure by which the change in the confession was effected. We made the inquiry with respect to the constitution, only that we might determine the identity of the organic structure; on no other grounds would the inquiry have been pertinent. We could have no such reason for investigating the procedure, as it relates to the confession, for, even though the irregularity be established,—and we concede as much,—the identity of the organized society remains. The latter is not affected by a change of faith.] [3] If the contention were, that the new had not supplanted the old confession, because of the irregular procedure in its adoption, and we were competent to pass upon that question, an inquiry into all the proceedings which led up to its adoption would be necessary. But both parties to this controversy assume that a valid and binding change was made, and therefore there is nothing left to consider but the effect and consequence of this change.

" The proposition insisted upon by the defendants, and which we are asked to affirm, is, that the new confession of faith differs so radically and materially from the old that by the adoption of the former a new and distinctive church has been established; and that to allow the property involved in the present dispute to be used by such church would be to divert the trust from the purposes intended by its founders.

" So much of this proposition as implies the power and duty of the court to interfere, and require a trust to be administered

according to the intention of its founders, when a misapplication is attempted, is conceded, of course. The duty of the court in such case is obvious. The trust which is recognized by the law will be protected by the law, and where the protection of the law is inadequate to the purpose, equity will come to the relief; for has it not been said that 'a trust is the child of the law, and more especially the ward of chancery?'

" But the other matters embraced in the proposition invite closer scrutiny. They suggest important and material inquiries.

" The existence of the trust, or religious use, is not denied. The origin of the title is found in John Dome, who by his deed declares that the lot was purchased for the purpose of erecting a Church of the United Brethren in Christ, and who then conveyed it to certain parties, trustees of said congregation, for the use aforesaid.

" If the conclusion already reached, viz., that the division of the local church here represented by the plaintiffs, known as the liberals, is the United Brethren congregation of Greencastle, because it is in connection with and in subordination to the legitimate government of the organized society, it needs no discussion to show that, so far as the will of the founders is expressed in the grant, they are the true and proper beneficiaries of the use. But it is contended on behalf of the defendants, that it is a necessary implication, derivable from the terms of this grant, that the beneficiary under the trust was to be a congregation of the United Brethren in Christ, distinguished and individuated as such, not only by name, but by adherence to the doctrines held and advocated by that church when the grant was made. To state it still more concisely, we give the proposition as we find it in the brief of the defendants' counsel —' that the [constitution and] confession of faith are as fully a part of every trust deed of conveyance as if written therein.'

" That the founders of this trust could have made adherence to the confession of faith as it then stood a condition of the use, will not be denied, since *cujus est dare, ejus est disponere.* But we are asked to go beyond this, and hold that, notwithstanding no such condition is expressed in the grant, yet the law implies as much, and imputes to the donor a purpose to impose, as a condition of the enjoyment of his bounty, that the congregation

should continue devoted to an unchanging and unchangeable faith. If such be the law, it makes largely for the defend-dants' contention, in spite of the fact, already ascertained, that the legitimate succession is with the plaintiffs.

"The essential elements of every trust are determined by the will of the donor. He it is who founds it, and whatever conditions he has imposed, and whatever purpose he has defined, if lawful, will be enforced, so that the end he had in view may be secured. The maxim of the old feudal system is still applied to modern grants—*tenor est qui legem dat feudo.* In the present case the donors or founders are those who contributed to the purchase of the lot, and the effort must be to ascertain the interests they desired to promote, and the purpose they had in view. It is of no consequence that the present house of worship was erected at a much later period by the voluntary subscriptions of members who stood in no relation to the congregation when the lot was purchased. By the common law, even subsequent contributors have no other right of direction than that which the founder has prescribed; for they come in and give their money on a basis already established, and they can neither add to it, nor take anything from it: Pres. Cong. v. Johnston, 1 W. & S. 37. The rules of construction require that we must first have recourse to the instrument by which the trust was created and the use declared. Here, then, it is the deed from Dome to the trustees. If that expresses with sufficient clearness for an intelligent understanding the wishes and intentions of the founders, we are forbidden to look beyond, and must accept what is there declared as conclusive. If its language interprets itself, we have no occasion to resort to rules of art or precedents to guide us.

"The deed is as follows : ' Know all men by these presents, that the within described lot of ground, No. 97, was purchased for the purpose of erecting a church for the United Brethren in Christ, and the said John Dome doth, by these presents, release and quitclaim his right of the within lot of ground to George Zeigler, Jacob Wingerd, Samuel Lenhard, and Solomon Moor, trustees of said congregation, for the only use and interest above described, and for no other purpose.'

"But very little is here expressed. Did the donors intend more ? They intended all that is legally and fairly inferable

from the language used, but to what extent does this carry us? We have a use declared for a particular congregation for the erection of a church for the United Brethren in Christ. That this contemplated that the congregation should be in connection and association with the larger organization, known as the church, is an unavoidable inference. Indeed, it may be said to be expressed, and it is about all that is. A denominational designation is used. What significance attaches to this? Can we infer from this fact that the distinctive faith, or rather the entire creed, of that particular denomination, whether distinctive or not, was made an essential element of the trust? Such, as we understand it, is the defendants' contention, and they would have us read in the words, ' United Brethren in Christ,' the entire Confession of Faith that was adopted in 1815.

" That by the use of a distinctively denominational name very much may be expressed, will not be denied. It is often of great help in determining the proper limits of a grant. In Hale v. Everett, 53 N. H. 70, it was held that when a conveyance is made to, or a trust created for the benefit or use of a religious society by its denominational name,—which denominational name is descriptive of the fundamental doctrine of the sect to which it belongs, with no other particular designation in the deed of the tenets or doctrines which it is to be used to advance or support,—the denominational name may be a sufficient guide as to the nature of the trust, so far as respects doctrines which are admitted to be fundamental. In the case in which this was said, the denominational name was ' The First Unitarian Society of Christians in Dover.' And it was very properly held that the terms Unitarian and Christian were both expressive of fundamental and essential doctrines, and that, by the use of a denominational name in which both these terms occurred, it was made an implied condition of the grant that the society should avow no doctrines inconsistent with these.

" But of what fundamental doctrine is the denominational name of United Brethren in Christ expressive? If any, it determines the use to that extent. It helps nothing to inquire what are the distinctive doctrines of the denomination, or whether it has any. What concerns us is to ascertain what distinctive doctrines are expressed in the denominational name.

Armenianism may be, and we are told is, one of the fundamental doctrines of the church ; but it is not ascertainable from the denominational name. The name is not contradictory of extremest Calvinism. So, opposition to all secret associations may be a distinguishing characteristic, but the name does not so inform us. If this name indicates anything as to doctrine, beyond the divinity of Christ and the brotherhood of all believers in Him, we fail utterly to see it. As to these doctrines, the name furnishes us with an unerring guide ; but its value stops right there.

" The cases all distinguish between a dedication of property to support particular tenets, and a dedication to support such tenets in subjection to a particular church government; and the rule is, that, when the cestui que trust is a congregation, indicated by its denominational name, the law will make it a condition of the grant that the congregation maintains the appropriate ecclesiastical connection ; but when nothing appears in the grant except the church name to indicate the form of belief, the law will make conditions only of those fundamental doctrines which the name clearly expresses. In Miller v. Gable, 2 Denio, 510, it is said : ' There may be a support of tenets without subjection to any ecclesiastical power which upholds them ; but it may be a condition of grant of property that a trust is to be maintained in subordination to a particular power ; as, if a church be established in connection with a particular ecclesiastical body, a severance from that body would be a violation of the trust.'

" In our own state we have entire unanimity of decision on the general principles which govern in these cases ; and while we find no single one—where matters of faith were the disturbing cause—which turns upon a declaration of use so meagre as this, yet they all accord with the authorities cited, and sustain the rule as we have stated it. That subordination to a particular church government may be made a fundamental condition, is the doctrine declared in Pres. Church v. Johnston, 1 W. & S. 37. It is repeated and emphasized in Means v. Pres. Church, 3 W. & S. 303. In App v. Luth. Cong., 6 Pa. 201, where the grant is almost identical with this, it is not only decided that it may be, but that it is, an essential condition ; and in that case there is nothing from which such condition could be inferred

but the denominational name.  So, too, in Roshi's Appeal, 69 Pa. 465, where the dedication was almost exactly similar—' in trust for the use of the said German Reformed Church.'

" ' The principle which governs in all such cases,' says Mr. Justice SHARSWOOD, ' is old and well established, and has frequently been asserted by this court.  Whenever a church or religious society has been originally endowed in connection with, or in subordination to, some ecclesiastical organization and form of government, it can no more unite with some other organization, or become independent, than it can renounce its faith or doctrine, and adopt others.'  McGinnis v. Watson, 41 Pa. 14, and Schnorr's Appeal, 67 Pa. 146, are to the same effect.

" These authorities all recognize this ecclesiastical connection, implying submission, as a fundamental condition, and several of them, as we have indicated, infer this condition from the use of the denominational name in the grant.  And however much any of them may seem to emphasize adherence to faith and doctrine, as a condition, it will be found to be only in cases where there is an expressed condition to this effect; and, even in such, they limit it to doctrines which are distinctive and fundamental.  In those of our state cases where the grant most resembles this one, the effort was to carry away the local church property, or at least to secede from the original organization. In Schnorr's Appeal, supra, one party having declared themselves independent of all synods, and absolved from the government of the church of which they had been a part, claimed the local church property, notwithstanding the fact that it had been conveyed ' for the use of the congregation of the German Evangelical Reformed Church, and with the condition that no change shall be made in said congregation for any other denomination.' It was in this case, and with reference to this positive prohibition in the grant, that Justice SHARSWOOD, in expressing his dissent from the language used in McGinnis v. Watson, supra, uses the emphatic language which is so much relied upon by the defendants.  He says: ' Courts which have the supervision and control of all corporations, and unincorporated societies or associations, must be guided by surer and clearer principles than those to be derived from the nature of intellectual and spiritual life.  The guarantee of religious freedom has nothing to do with the property.  It does not guarantee freedom to

steal churches. It secures to individuals the right of withdrawing, forming a new society, with such ends and government as they please, raising from their own means another fund, and building another house of worship; but it does not confer upon them the right of taking the property consecrated to other use, by those who may now be sleeping in their graves.'

" What is this but saying that the will and intentions of the donor alone determine the limitations and conditions of the trust, and that, when these are clearly expressed, the law of the land, which is superior to any supposed 'law of intellectual and spiritual life,' in its operation on property rights, at least, will enforce them.

" In App's Appeal, supra, the bequest was claimed by a congregation which did not belong to the old Lutheran church, was attached to a new synod, and not under the same ecclesiastical government that ruled when the bequest was made. McGinnis v. Watson, supra, was a case of secession. In Pres. Church v. Johnston, supra, there was no ecclesiastical connection prescribed. And so we might distinguish all the cases from the one we are now considering. None of these suggest anything inconsistent with the rule of the interpretation as we have stated it; while in several, as we have shown, it has been applied in a most conclusive way.

" Confining our search, then, for the intentions of these donors, to the words of the conveyance from Dome, can we discover any intention to impose other conditions than that the beneficiary must be a congregation in connection with the Church of the United Brethren in Christ? That it must be distinctively Christian in faith, and accept the doctrine of the brotherhood of all believers in Christ?

" If more was intended, could it not have been easily expressed? As was said in Princeton v. Adams, 10 Cushing, 129, it is perfectly easy for persons giving their own private property to a religious use, to limit that use, and devote the property to a particular faith. And as was said in the Dublin Case, 36 N. H. 510, ' they need no professional assistance or technical learning to supply them with a peculiar phraseology; any intelligible language will answer the purpose. They can have no difficulty in saying in some comprehensible form, that they intend the dissemination of the thirty-nine articles of the English Church,

or the Westminster Catechism; the doctrines of Luther, or Loyola; of Edmonds, or Channing, or Jefferson; the tenets held by some sect at a certain time, or such as it may hold from time to time in the course of its existence in a changing world. If they intend a theological limitation, they will express it; and then the court may be called upon to decide, by legal rules settled by the wisdom of ages, not what the faith is, but what limitation is expressed by the words used.'

" If, by our interpretation, we have confined this trust within limits too narrow, to what extent are they to be opened up? Can it be maintained, for a moment, that they are to include, as an essential condition, the entire confession of faith which was recognized by the denomination when the trust was created? If so, it must be by necessary intendment, from the single fact that there was such a confession in existence. Any such view not only imputes to the donors what they did not express, and which could have been readily expressed, if intended, but it ignores what we have tried to show was the paramount purpose, because it is expressed, to wit: to place the subject of the trust in a congregation in subjection to the general order and government of the church at large. The United Brethren in Christ were an organized body long before the trust was created. So, too, the Greencastle congregation had an earlier existence, and was in ecclesiastical connection with the general body, and subject to its authority and legislation, when the property was dedicated to its use. This much the donors knew, and are presumed to have had in contemplation. Is it reasonable to suppose, under such circumstances, that they intended a use inconsistent with the submission of the congregation to established authority?

" We think it evident that the paramount purpose was to secure the property to the local society, in subordination to the higher authority of the church, whereby the regular connection and relation of the parts to the whole would be secured. And surely, if this be correct, such a qualified use as is here contended for would be inconsistent with this purpose, except upon the theory that it is beyond the power of the church to change its creed—an assumption which we cannot allow. Why cannot the church change its creed? It made it; and why cannot the same power which made, unmake? It can change its name, its

order of worship, its discipline, its government; then why not its creed? To deny it this right, is to deny its existence as an organized society, or else deny it the freedom of conscience which is guaranteed to the individual. The power to make, implies the power to change; it is inherent and inextinguishable as well in churches as in individuals. We are not denying that certain legal consequences affecting property rights may result from a change of creed; what we are saying is, that the power to change the creed is implied in the very existence of the church, and that this power inhered in the church before, and at the time when this particular property was dedicated to a local congregation in connection with the church. This the donors are supposed to have known, and to have indicated the use accordingly. With this knowledge, either actual or imputed, of the inherent power of the church over its creed, is it not, and ought it not to be, a controlling circumstance in the case, that no condition whatever in regard to faith or doctrine, beyond what is expressed in the denominational name, can be found in the letter of the grant? We certainly so regard it, and in this view we are largely supported by the case of Gibson v. Armstrong, 7 B. Monroe, 481, which stands out with the prominence of a guidepost.

"It is no answer to say that it was in the belief that the church would adhere to its confession of faith as then written, for all time to come, that the dedication of the property was made. That is assuming a fact in support of which there is no evidence at all. But grant it to be a fact; what have we to do, in determining this question, with the belief and inducements which operated on the minds of the donors, when they have expressed in the grant itself the use they intend? If the grant were doubtful or uncertain,—which it is not,—we could resort to extrinsic circumstances, and consider perhaps the belief and motive of the grantors as aids, but not otherwise.

"This grant cannot be regarded as requiring extrinsic evidence to construe it, simply because it may be thought by some from the circumstances under which it was made, and its brevity, that more was intended than is expressed. Any such rule would open the way for extrinsic evidence to disturb, if not destroy, any trust in existence.

"And when a church, in the exercise of its undoubted right,

in a legal and sufficient way, changes its creed, what property rights are affected thereby? It unquestionably forfeits its right to all property, the use of which was conditioned by the donor, in his grant, on an unchangeable creed; but nothing beyond. We have argued to show that the conditions in the present case are, that the property be used by a Christian congregation in connection with a particular denomination, holding to the doctrine of the brotherhood of all believers in Christ. Any connection with a different denomination, or the avowal of a faith inconsistent with the doctrines of the Christian religion, or the brotherhood of believers in Christ, would be a perversion of this trust, such as the law would forbid and correct; but until such radical and fundamental perversion as this is attempted, those whom we have found to compose the true and real congregation at Greencastle, and here represented by the plaintiffs, are entitled to the undisturbed possession and enjoyment of the church property.

"In the view we have taken of this, any further examination into the changes made in the confession of faith is unnecessary. It remains distinctively and unequivocally Christian in its character. So much is conceded; and it is all that concerns us to know. We may, however, be permitted to add that in comparing the new with the old, we fail to see how anyone professing his belief in either could be denied membership or fellowship, in the society which professes belief in the other. Literally, they are not the same; but if inconsistent with, or repugnant to, each other with respect to any doctrine which has ever been made the basis of separate denominational existence, such fact has not been brought to our notice. The school men may have made some of the points of difference the subject of their violent polemics; and it may interest the student of history or science to know just how they were regarded by these men who were so wasteful of their learning and zeal; but in modern Christian thought, they are not considered of sufficient importance to disturb the unity of the faith.

"Since, then, the liberal congregation at Greencastle, here represented by the plaintiffs in the original bill, is in connection with and subordinate to the authority of the legitimate Church of the United Brethren in Christ; and since none of the conditions of the grant under which it holds the property now in

dispute have been violated, it follows that these plaintiffs are entitled to the relief prayed for, and that the defendants' cross bill must be dismissed.   The following decrees are now entered:

DECREE.

" [Now, 25th of August, 1891, this cause came on to be heard, and was argued by counsel.   And thereupon, upon consideration thereof, it is adjudged, decreed, and declared :

" I. The said H. A. Schlichter was, at the time of the filing of the plaintiffs' bill, presiding elder of the said Chambersburg district; the said Theophilus Wagner was the preacher in charge of the Greencastle circuit, and superintendent of the Sunday school of said church at Greencastle ; and said Henry Strealy was leader of the class there.] [4–7]

" [II. The said J. F. Fisher, J. N. Sheely, J. F. Wilt, C. R. Hoover, Simon Burns, E. Bovey, and J. Hellane were, at the time of the filing of the plaintiffs' bill, and still are, the board of trustees of the said congregation of the Church of the United Brethren of Christ at Greencastle, exclusively entitled to exercise the rights, powers, and duties of trustees of said lot of ground and meeting house mentioned and described in paragraph XVII of the plaintiffs' bill.] [8]

" [III. The said lot of ground belongs to, and is the exclusive property of, the plaintiffs and the other members of said congregation of the United Brethren in Christ at Greencastle commonly called ' Liberals,' who, with the plaintiffs, recognize the authority of, and as a congregation are in ecclesiastical connection with, the general conference of the Church of the United Brethren in Christ, as constituted of a majority of the delegates thereto after the session of fifteen of the members thereof at York, Pa., on the 13th day of May, 1889.] [9]

" And it is further ordered, adjudged, and decreed :

" [IV. That the said M. F. Keiter, and any other person claiming or to claim to exercise the office of presiding elder, under and by virtue of an election or appointment by any annual conference or other body or person except in Pennsylvania Annual Conference, subordinate to the said general conference, constituted as aforesaid, be, and they are hereby, perpetually enjoined and restrained from exercising any authority whatever as presiding elder of the said Chambersburg district.] [10]

" [V. That the said Peter Nicklas, and every other person

acting under any appointment by any annual conference or other body or person other than the proper annual conference subordinate to the said general conference, be, and they are hereby, restrained from exercising the office of preacher in charge of said Greencastle circuit.] [11]

" [VI. That the said Peter G. Strine, Adam Bear, Sen., Adam Bear, Jun., Samuel Crist, David Smith, F. W. Barnhart, and Frank Yates, and every one of them, be, and are hereby, enjoined from acting as trustees of said lot of ground and meeting house in the plaintiffs' bill mentioned, and from exercising any of the rights, powers, and duties of trustees with respect thereto, and from interfering with or in any way hindering the persons hereinbefore declared to be the board of trustees, in the possession and control of the same, and they and every one of them be, and hereby are, enjoined and restrained from using and occupying the said meeting house and lot for public worship, or for religious or devotional exercises, or any other purposes whatever, and from exercising any control over the said church building, property, or grounds.] [12]

" [VII. That the said defendants be, and hereby are, commanded to restore the plaintiffs and those whom they represent in this cause to the exclusive and uninterrupted enjoyment of said lot and meeting house. And it is further ordered, adjudged, and decreed, that a writ of injunction do issue forthwith against the defendants, commanding them to comply with all and singular premises so enjoined upon them.] [13]

" [And it is further ordered, adjudged, and decreed that the cross bill do stand dismissed, with costs to be paid by the plaintiffs therein to the defendants therein.] [14]

" [And it is further ordered and decreed that the plaintiffs do recover their costs in the premises, to be taxed by the masters sec. reg.] " [15]

*Errors assigned* were, (1–3) portions of the opinion in brackets above ; (4–15) portions of decree ; quoting them as above.

*O. C. Bowers*, for appellants.—The constitution of 1841 was, from the time of its adoption, the organic law of the church of the United Brethren in Christ. The amended constitution of 1889 was not legally or regularly adopted in accordance with

the method in the constitution of 1841 for the amendment or change thereof.  The election, at which it is supposed by the plaintiffs that the amended constitution and revised confession of faith were ratified by the people of the church, was not an election authorized by law, and therefore those voting had no power to represent or to bind those who did not choose to vote : Wells v. Bain, 75 Pa. 47.

In support of the proposition that " request of two thirds of the whole society " is not to be construed to mean two thirds of those voting, we refer to the following authorities : Com. v. Wickersham, 66 Pa. 134 ; State v. Winkelmeier, 35 Mo. 103 ; State v. Sutterfield, 54 Mo. 391 ; State v. Foraker, 46 Ohio, 677 ; State v. Swift, 69 Ind. 505 ; State v. Com'rs, 6 Neb. 474 ; State v. Babcock, 17 Neb. 188 ; State v. Brown, 11 Ill. 478 ; State v. Wiant, 48 Ill. 263 ; Enyart v. Hanover Township, 25 Ohio, 618 ; Com. v. Green, 4 Whart. 520 ; 6 A. & E. Enc. L. 293.

An election can only be held by a proper officer ; and the power to order and hold elections cannot be delegated : Com. v. Baxter, 35 Pa. 263 ; People v. Mathewson, 47 Cal. 442 ; People v. Johnston, 6 Cal. 673 ; 6 A. & E. Enc. L. 297.

Under the constitution of 1841 the confession of faith was absolutely unchangeable, at least so long as that constitution remained the organic law of the church : Luther v. Borden, 7 How. 1 ; State v. Swift, 69 Ind. 525 ; State v. Governor, 46 Ohio, 667 ; Collier, Governor etc., v. Frierson, 24 Ala. 100 ; Austin v. Searing, 69 Am. Dec. 672 ; Wayland's Moral Science, 334.

The revised confession of faith was not adopted in accordance with any law of the church ; not even in accordance with the provisions of the amended constitution of 1889.

The revised confession of faith is materially different from the old, in that it changes many of the doctrines contained in in the old, rejects or ignores others, and adds new doctrines thereto.

The courts have jurisdiction to inquire and determine whether or not the action of the church authorities in relation to the adoption of the amended constitution and revised confession of faith was in accordance with its own organic law ; and if it was not, to declare such action ultra vires and void, especially

in view of the fact that property rights are involved : Watson
v. Jones, 13 Wal. 722; McAuley's Ap., 77 Pa. 397; Kerr's
Ap., 89 Pa. 97; Schnorr's Ap., 67 Pa. 138; McGinnis v.
Watson, 41 Pa. 9; Roshi's Ap., 69 Pa. 462; Hochreiter's Ap.,
93 Pa. 479; O'Hara v. Stack, 90 Pa. 477; Pres. Cong. v.
Johnston, 1 W. & S. 9; App v. Luth. Cong., 6 Pa. 201; Church
of Scranton's Ap., 16 W. N. 245.

*W. Rush Gillan* and *Alexander Stewart, D. Watson Rowe*
with them, for appellees.—The constitution of 1841 was never
submitted to the people of the church for approval or rejection.
Authority it had none, during all its existence, beyond that it
acquired by the enactment of the conference.   To call an in-
strument with such history and such origin a constitution is
a contradiction in terms, when the well defined meaning that
word has acquired in American jurisprudence is remembered :
Cooley, Const. Lim., p. 5; State v. McCann, 4 Lea, 9; People
v. R. R., 24 N. Y. 486; McKoan v. Devries, 3 Barb. 198; Van-
horne v. Dorrance, 2 Dal. 308; State v. Parkhurst, 4 Halst.
443 ; Wells v. Bain, 75 Pa. 39; Woods's Ap., 75 Pa. 59.

One session of such body cannot by its own mere act dero-
gate from the power of succeeding sessions : 1 Bl. Com.
90; Cooley's Const. Lim. 146; Bloomer v. Stolley, 5 McLean,
158; Com. v. Mayor of Lancaster, 5 Watts, 152; Wall v.
State, 23 Ind. 150; State v. Oskins, 28 Ind. 364; Oleson v. R.
R., 36 Wis. 383; Christ Church v. Pope, 8 Gray, 140; Kellogg
v. Oshkosh, 14 Wis. 623; 3 A. & E. Enc. L. 691; Smith v. Nel-
son, 18 Vermont, 512; Mott v. Pa. R. R., 30 Pa. 35; Stone v.
Mississippi, 101 U. S. 814.

We are bound to assume that in adopting article 4 the con-
ference meant to provide a way for future alterations in its
work, and we must not, in view of that, give to its language
any construction which would lead to a manifest absurdity, and
the construction for which the appellants contend leads to the
most manifest of all absurdities—that of defeating the avowed
object.   Every intendment is against such construction : Vat-
tel, book 2, 17, § 282; Smith's Stat. Const. § 695; Dwarris's
Const. of St.; Story's Com. Const. § 194.

The only construction of which article 4 of the constitution
is capable is that thereby the conference intended to secure to

the people a voice in the alteration of that instrument, and to provide that no such alteration be made without the people's assent emphatically expressed : Wells v. Bain, 75 Pa. 47 ; Com. v. Green, 4 Whart. 604.

When an election is authorized by law, the electors who represent the state, or whole people, are bound to attend, and if they do not can be bound by the expression of the will of those who do attend : Wells v. Bain, 75 Pa. 47 ; Craig v. Presbyterian Church, 88 Pa. 42 ; County v. Johnston, 5 Otto, 359 ; St. Joseph Township v. Rogers, 16 Wal. 644 ; Carroll v. Smith, 111 U. S. 556 ; People v. Wiat, 48 Ill. 263 ; State v. Woodford, 15 Kan. 500 ; McCreary on Elections, 3d ed., § 173 ; Lamb v. Cain, 129 Ind. 486 ; Com. v. Wickersham, 66 Pa. 134.

The interpretation of this constitutional provision was a proper subject for the judicial action of the general conference. From that decision no appeal lies, for there is no higher tribunal in the church and we cannot rejudge its decrees : Watson v. Jones, 13 Wal. 679 ; Church v. Seibert, 3 Pa. 291 ; McGinnis v. Watson, 41 Pa. 10 ; Harmmon v. Dreher, 1 Sp. Eq. (S. C.) 87 ; Ferraria v. Vasconcelles, 23 Ill. 456 ; Greenough v. Greenough, 11 Pa. 489 ; Wayman v. Southard, 10 Wheat. 000 ; Cooley's Const. Lim. 53, 54 ; Park v. Boston, 8 Pick. 217 ; Kendall v. Inhabitants of Kingston, 5 Mass. 524.

The true test in this case is " which of these parties represent a congregation in ecclesiastical connection with the United Brethren church, in proper succession to the church of that name as it existed in 1828, and professing no doctrine inconsistent with a belief in Christ and the brotherhood of believers in Him ? "  We confidently affirm that the application of that test must be conclusive in favor of the appellees : McBride v. Porter, 17 Iowa, 211 ; Presbyterian Congregation v. Johnston, 1 W. & S. 1 ; McGinnis v. Watson, 41 Pa. 9 ; Roshi's Ap., 69 Pa. 462 ; Schnorr's Ap., 67 Pa. 138 ; Means v. The Church, 3 W. & S. 303 ; App v. Lutheran Congregation, 6 Penn. 201 ; White-Lick Quakers, 89 Ind. 88 ; Miller v. Gable, 2 Denio, 493 ; Hale v. Everett, 53 N. H. 70 ; Chase v. Cheney, 58 Ill. 509 ; Gibson v. Armstrong, 7 B. Mon. 481 ; State v. Farris, 45 Mo. 183.

There were no radical changes made in the confession.  Mere changes in the expression were allowable : Keyser v. Stansifer, 6 Ohio Rep. 363 ; Church v. Seibert, 3 Pa. 291.

OPINION BY MR. JUSTICE WILLIAMS, July 19, 1893:

The right to the decree asked for in this case depends on a question of ecclesiastical identity. The question is, which of the parties and organizations represented by them is the church and society known as the " United Brethren in Christ." The society was a unit prior to 1889. It had a system of polity and a creed, which were accepted throughout the whole church. They had taken form gradually, with the growth of the church, from a small beginning a hundred years or more ago, until they were reduced to form by the general conference. This was done, so far as the confession of faith is concerned, in 1815. The constitution was formulated and adopted in 1841. The confession of faith remained without any considerable change for three quarters of a century. The constitution had been recognized and accepted as the fundamental law of the society for a half century. The system of polity provided for the grouping of individuals into local congregations or churches. An indefinite number of churches were grouped to form a circuit. Circuits were united to make a district, and these, held together by the denominational bond, made up the church. The ecclesiastical power of the society was distributed through a succession of courts or tribunals. The church officers exercised this power in the individual congregation. In the circuit it was exercised by the quarterly conference ; in the district, by the annual conference ; and for the whole society the general quadrennial conference was the supreme legislative and judicial body. Its confession of faith was brief, and in its outlines was what may be described as Christological. Under these simple fundamental rules of polity and articles of faith, the society had grown until, in 1889, its membership numbered over two hundred thousand, distributed over many states. It had become one of the influential protestant organizations, and was the owner of much valuable church property. The local church at Greencastle was organized and officered prior to 1889 under the authority of this united and prosperous society, and was in full connection with it. The officers of this local church are the plaintiffs in this case, and they insist that, since 1889, as truly as before, they have the right to the possession of the house of worship and the lands appurtenant, belonging to the church at Greencastle.

Looking at the position of the defendants, we find that on the church records as far back as 1865 there is evidence to show a growing difference of opinion in regard to three points of polity. These were the admission of lay representation, the ratio of representation and the attitude of the church towards secret societies.

The constitution of 1841, art. 2, sec. 7, contained this provision: " There shall be no connection with secret combinations." This declaration was indefinite. It was susceptible of an interpretation so broad as to prohibit membership in the various social, charitable and mutual aid societies that have grown so rapidly in number and in favor in recent years. It might with equal, if not better, reason be construed as having reference to unlawful secret combinations, and not intended to interfere with lawful organizations whose advantages were restricted to their own membership.

The attitude of those who held to the first of these positions was regarded by many as imposing an unnecessarily hard restriction upon the freedom of action of the individual members of the church. The sentiment in favor of increased liberality towards the laity, in admitting them to participate in the government of the society, and removing unnecessary restrictions upon their individual action, grew steadily. Finally, in 1885, it had become so strong that a decided majority of the members of the general conference took action upon the subject. In a carefully worded resolution they expressed their belief that both the creed and constitution could be improved in clearness and fullness of statement, and by this means brought more thoroughly into harmony with the views and wishes of the church. This was a mild form of revision, and the conference entered very deliberately upon it. The first thing done was to raise a committee of thirteen members to consider the subject and report. After considerable deliberation eleven members of the committee united in a report setting forth: " It is the sense and belief of your committee that the constitution as it now stands is not in harmony with the present wishes of our people, as has been indicated in discussion, petitions and elections, during the past year;" and recommending that a commission, to consist of twenty-seven members, including all the bishops of the church, should be appointed to " consider our present confession

of faith and constitution, and prepare such a form of belief, and
such amended fundamental rules for the government of this
church in the future as will be best adapted, in their judgment,
to secure its growth and efficiency in the work of evangelizing
the world."

This commission was made up so as to distribute its members
among the several districts composing the society, and was sub-
jected to the following lines of limitation, viz. : " to preserve
unchanged in substance the present confession of faith so far
as it is clear . . . . to retain the present itinerant plan . . . .
to keep sacred the general usages and distinctive principles of
the church on all great moral reforms." When the commission
should complete its work of revision along these narrow and
conservative lines, it was instructed to submit it to the member-
ship of the society for approval or disapproval, in such manner
as to secure general attention to it, and place it in the power
of every member who would do so, to express his or her opinion.
This action was in no sense revolutionary. It did not propose
to cut loose from any distinctive theological doctrine, or from
the general system of polity theretofore held by the society.
The commission entered upon its work and revised both the
confession of faith and the constitution, with a view to greater
clearness and fullness of statement upon certain doctrines ; and
greater liberality toward the membership in their individual
action upon the subject of secret societies. Both documents
were put in a more connected and logical form, and were re-
lieved from the indefiniteness and ambiguity of expression out
of which the differences of interpretation had arisen.

The revised documents were then submitted to the society
for an expression for or against their adoption, in lieu of the
constitution and confession then in use. Nearly three years
were given for discussion and examination. At the end of this
time a vote was taken throughout the society. The returns
showed a very large majority of the votes to be in favor of the
substitution of the revised forms for the old. At the general
conference of 1889 the commission reported its work, the sub-
mission of it to the society, the votes given for and against its
adoption, and submitted the whole to the consideration of that
body. In this report twenty-five of its members concurred.
One bishop and one other person dissented and submitted a
minority report.

The general conference then referred the majority report to a special committee charged to examine and report whether the commission had followed the instructions given to it, kept within the prescribed limits, and submitted its plan of revision to the society in a proper manner. All but two of this committee joined in a report affirming that the commission had acted with fidelity, had observed the limitations imposed upon their action, and had submitted their work to the membership by whom it had been approved. They therefore recommended that the bishops should issue a proclamation announcing the adoption of the revised documents, and declaring them to be the confession of faith, and the constitution of the Church of the United Brethren in Christ. This report was adopted by the very decisive vote of 110 yeas to 20 nays. The proclamation was accordingly made and the revised forms became thereupon, and thereafter, the accepted and binding law of the church.

Fifteen of the twenty who voted nay, Milton Wright, a bishop, being of the number, withdrew from the general conference at this stage of the proceedings, and organized another general conference at another place in the same city, and assumed to be the true general conference of the whole church, and to have the rightful authority to manage and control all the property, business, and work of the church. The original body, containing one hundred and fifteen members, kept on in its work. The new body with fifteen members entered upon a rival system of regulation and control. The local congregation at Greencastle divided over the same subject. The majority adhered to the original or majority conference. A minority followed the minority in the conference, organized a new body, and took possession of the house of worship and property belonging to the local church, and excluded the majority therefrom. The officers of this new congregation at Greencastle are the defendants. The subject of the litigation is the house of worship and other property of the church at that place. The question raised is which of these parties is, or represents, the Church of the United Brethren at Greencastle ? for to that one possession of this property should be awarded. It appears that the real estate in question was conveyed to trustees for the use of " The United Brethren in Christ," in Greencastle, as early

as 1828, by one John Dome.   A church of the United Breth-
ren was organized prior to, or during that year, which was the
beneficiary intended by the donor.   It has had a continuous
existence since.   It was the only organized society of that name
in Greencastle until the withdrawal of the fifteen members of
the general conference in 1889, followed by the organization
of a new conference, and the division of the church.   The
plaintiffs and their predecessors have been in continuous pos-
session for more than sixty years.   The prima facies of the situ-
ation is with them, and it is incumbent on those who claim a
right to dispossess them and hold the possession against them
to show affirmatively how and when their title accrued, and that
it is a good and valid title.

The learned counsel for the defendants fully and clearly
understood the requirements of his position, and put the rea-
sons on which he rested his contention into seven propositions.
The first of these asserts the validity of the constitution of
1841.   The fourth asserts the "absolute unchangeability " of the
fundamental law of the church, at least as to the confession of
faith, under that constitution.   The second, third and fifth
deny the regularity and legality of the action of the confer-
ences of 1885 and 1889.   The sixth affirms that the revision
made in 1889 was so radical as to be subversive, and to destroy
the identity of the church.   The seventh insists that the courts
have jurisdiction to inquire into and determine these questions
in order to settle the title to the real estate now in controversy.

It will appear from what we have already said that we assent
to the first proposition.   Acquiescence and use for fifty years
settled that point.   We are prepared to assent to the seventh
proposition.   It is the duty of the courts to settle the question
of the right to the real estate conveyed by John Dome in trust
for the Church of United Brethren in Greencastle.

The sixth proposition raises a question of fact.   It asserts
that the revision made a complete theological departure from
the creed of the church as it stood before 1889.   The master
has found that this is not so, and, on the other hand, that the
theology of the creed of 1815 and that of the revision are the
same in every essential particular, differing only in clearness of
expression and completeness of statement.   The learned judge
of the court below in an excellent opinion has concurred in,

and vindicated fully, this conclusion of the master.  This question is therefore disposed of, unless clear error in the findings is pointed out.  We have attentively considered the suggestions made to us on this subject by the appellant; we have examined the old and the revised confessions; we have read the testimony of the distinguished theological experts who were called to testify as to the alleged doctrinal differences, and we are satisfied that the master and the court were right in denying the sixth proposition.  There has been no substantial departure from the ancient beliefs of the church.  The revision is simply a clear and ample statement of the great doctrines that are to be found in the creed of 1815, or that logically result from them.  The " general usages and distinctive principles of the church" are preserved.  Identity in both polity and creed are undisturbed.  We feel the more satisfaction with this conclusion, since it is in harmony with that reached by the court of last resort in matters of faith and discipline, within the church itself, viz.: the general conference; and with the conclusion reached by a clear majority of the entire membership.  If the question was one of doctrine alone, we should feel inclined to treat the decision of the general conference as final, in accordance with the rule laid down in several cases, among which are App v. The Lutheran Congregation, 6 Pa. 201; German Reformed Church v. Seibert, 3 Pa. 282; McGinnis v. Watson et al., 41 Pa. 9.

Two of the questions raised by the defendants' propositions remain to be briefly considered: (1) Was the confession of faith absolutely unchangeable under the constitution of 1841? (2) If not, was the change made in 1889 so made as to have a binding force upon the church?  The appellants' argument upon the first of these questions rests on sec. 4 of art. 2 of the constitution of 1841.  It is as follows: " Sec. 4.  No rule or ordinance shall at any time be passed to change or do away with the confession of faith as it now stands nor to destroy the itinerant plan."  This provision is not to receive a technical interpretation, but is to be construed in the light which the whole instrument throws upon it, and so as to advance the interests of the church and promote its objects.  Monongahela Nav. Co. v. Coons, 6 W. & S. 114; Commonwealth v. Clark, 7 W. & S. 127; Commonwealth v. Hartman, 17 Pa. 119; Com-

monwealth v. Maxwell, 27 Pa. 444. The purpose and effect of sec. 4, when so construed, is not to prohibit changes in the confession of faith that are in the interest of clearness of expression, or fullness of statement, of the accepted doctrines of the church, but to prevent changes in the doctrines to which the church was committed. The provision was not intended as an impassable barrier thrown in the way of improvement of all sorts, but as a protection against the introduction of heretical doctrine, destructive of the distinctive theological character of the church. It follows that the changes made in 1889 were not within the prohibition of this section, since they are shown to be changes in statement in the interest of clearness and completeness of declaration of belief in the doctrines actually held by the church, and which are found less fully stated in the confession prepared in 1845.

The contention of the appellant upon this subject fails, therefore, for this reason : The confession of faith was not " absolutely unchangeable " in its manner of expressing the doctrines held by the church. It was unchangeable so far as relates to the distinctive doctrines or principles actually embodied in it.

We come finally to inquire whether the proceedings of the conference, and the commission, and the expression of assent and dissent by the society, are substantially in harmony with the provision of the constitution of 1841 that authorized changes on the request of two thirds of the whole society. The exact words of the provision are : " There shall be no alteration of the foregoing constitution unless by the request of two thirds of the whole society." Alterations are not forbidden, but as the constitution is the fundamental law of the whole society, it is proper that it should be changed only by the action or assent of the body affected by it. But there are two requirements to a lawful alteration ; the action of the society, and the action of its highest church judicatory. The action of the first must be formulated and declared by the last; which body—the popular one described as the society, or the ecclesiastical body called the general conference—shall originate the alteration, is not prescribed. The proposition may therefore come from either. The bishops and clergy who make up so largely the membership of the conference are, by reason of their constant attention to religious and theological subjects, and the working of the ma-

chinery of the church, peculiarly qualified to lead the thought of the church on all such subjects. It is not desirable, nor is it necessary, under the provision we are considering, that they should sit with folded hands waiting to be addressed by the society on any subject of denominational or religious importance. They may, and it is clearly their duty to, direct attention to any given subject. They may urge its consideration, and counsel speedy action, but they cannot make the change that is needed. The society must move. The word employed is "request;" but how or when, in the course of procedure, the request must be made, is not stated. It may therefore be in any manner that expresses the desire of the society, and at any time before the final act of the conference. The only thing that can be positively affirmed as to its character is that it must express the wish of the society. In the present case action by the conference preceded and followed the expressed wish of the membership. That which preceded suggested the desirability of certain changes and reduced them to form for the examination and action of the society. That which followed, rested on the expressed wish of the society in regard to the proposed changes, and carried it into effect. The whole society was taken into council by the conference. Its wish was asked and its answer received. The enrolled membership at that time was something over two hundred thousand. Of this number 51,070 signified their desire for the proposed change by an affirmative vote. Those voting against the acceptance of the revision were only 3310. Those who preferred another mode of proceeding than that which had been taken, and petitioned the general conference accordingly, were 16,187. The total number of those who expressed themselves upon the subject was 70,567. This was more than one third of the enrolled membership. How many of those who made no response to the request of the conference for an expression of opinion were old and feeble, how many were young and immature, how many were wholly indifferent to the subject, we have no means for estimating.

It is said that some refrained from voting because of objection to the proposed revision, or the mode of proceeding to ascertain the wish of the society. If so it was an ineffectual kind of opposition. In all elections the non-voting must be

counted as willing to be bound by the action of the majority of those who vote. Any other rule would lead to interminable trouble and uncertainty: Craig v. The Presbyterian Church, 88 Pa. 42. In elections under the laws of the states or the United States this has never been doubted. In parliamentary bodies the same thing is true, unless the rules of such body require that a quorum of the membership shall participate. In that case it is a majority of the required quorum, not of the whole body, that is necessary to the validity of any proposed action. A majority consists of more than one half of those who vote at a given election, not of those who might have voted, but did not vote; for we have no machinery for ascertaining the number of the latter class, and we should find it still more difficult to determine on what side they should be counted. It is true that the voting in this case was not done under the authority of any general law of the church, and that it is not to be treated in all respects as an election. It was in its object and results a mere expression of the individual preference, wish or request, of the voter. If any of the members of the society felt that they had no wish or request to express on the subject, it was proper for such persons to say so by refraining from any expression in answer to the request of the general conference. But if a positive preference was felt, it was the privilege, if not the duty, of the member entertaining such preference to express it, for the information and guidance of the highest ecclesiastical tribunal in the society. To one looking at this subject from the standpoint of a disinterested spectator, it would really seem as though courtesy towards the growing body of the denomination, love for the church, and zeal for its prosperity and peace, alike required those who opposed revision to say so squarely on all suitable occasions, with voice and vote. The inference is a natural one that those who did not oppose were either favorable or indifferent to the proposed change.

Our conclusions on the whole case are as follows: This society had a constitution and a confession of faith prior to 1889, which established both the polity and the creed of the church beyond question "so far as they were clear" and complete in expression.

The general conference suggested revision of both documents, not for the introduction of new or heretical doctrine, but in the

interest of clearness and fullness of declaration of the actual belief of the society; and for the removal of ambiguity and uncertainty from the written documents.

The " whole society " was asked in a regular and proper manner, to express its preference or wish upon the adoption or rejection of the revision proposed. An ample time for consideration and decision was afforded them, and a suitable system provided for gathering up the result of the wishes and preferences to be expressed.

A very large majority of those who expressed any wish on the subject favored the revision proposed. In conformity with the request or wish of the society, the general conference of 1889, by proclamation made by the bishops of the church, under its direction, declared the fact that, by the concurrent action of the society and the general conference, the revised constitution and confession of faith had been adopted, and were to be accepted as the constitution and creed of the society. This general conference and the churches adhering to it are the Church and Society of the United Brethren in Christ as fully to all intents and purposes as they were prior to 1889.

Those who withdrew from the conference of 1889 and organized another conference, together with those who adhere to them, while they may be in theological belief and religious observances identical with the body from which they withdrew, are ecclesiastically distinct, as a result of their own acts, and they have no title to the property held by the society prior to 1889.

The plaintiffs are therefore entitled to the relief prayed for, and provided by the decree appealed from, and the decree is now affirmed. The appellants to pay the costs of this appeal.