## Heuchert, Appellant, *v.* State Harness Racing Commission.

Argued April 17, 1961.   Before Jones, C. J., Bell, Musmanno, Jones, Cohen, Bok and Eagen, JJ.

*Robert D. Abrahams,* with him *Frederick D. Lipman, Romain C. Hassrick,* and *Abrahams & Loewenstein,* for appellants.

*Harry L. Rossi,* Counsel for State Harness Racing Commission, with him *Anne X. Alpern,* Attorney General, for Commonwealth, appellees.

Opinion by Mr. Chief Justice Jones, May 2, 1961:

The plaintiffs instituted this suit in equity in the Court of Common Pleas of Dauphin County to enjoin the Secretary of Agriculture and the State Harness Racing Commission from issuing a license to conduct a harness racing track in Philadelphia County to any person or corporation and from otherwise carrying out the provisions of the State Harness Racing Act of December 22, 1959, P. L. 1978, 4 PS §301 et seq. The defendants, acting by the Attorney General, filed preliminary objections in the nature of a demurrer to the complaint. After argument, the chancellor entered a decree nisi dismissing the complaint. Upon exceptions thereto, the court en banc unanimously confirmed the adjudication and decree nisi and entered the final decree from which the plaintiffs have appealed.

In summary, the State Harness Racing Act provides for a State Harness Racing Commission of three members appointed by the Governor to license annually not more than four corporations to conduct harness race meetings in the Commonwealth with provision for the pari mutuel system of betting by patrons of the tracks. The Commission shall not consider an application for a license "until a majority of the electorate of the county in which the racing plant is located shall have voted in favor of locating a racing plant within the county" at a primary election. Such an election shall be conducted when at least 5,000 registered electors of any county petition the Commission therefor. The Act imposes a 5 percent tax upon the admission price of tickets to harness race meetings and a 5 percent tax upon the amount wagered through pari mutuel betting. All moneys received by the Commonwealth under the provisions of the Act shall be paid into a special State Harness Racing Fund. After the payment of expenses incurred by the Commission, including salaries of the employees thereof, three-fourths of the remaining

moneys shall be paid into the General Fund of the Commonwealth. The balance shall be paid into a special fund known as the Pennsylvania Fair Fund to be distributed annually in specified amounts by the Secretary of Agriculture to county agricultural societies and independent agricultural societies conducting annual fairs or horse races.

On May 2, 1960, the three plaintiffs, taxpayers and residents of Philadelphia, Fulton and Sullivan Counties, respectively, filed the complaint in equity, here involved, against the three members of the Commission and the Secretary of Agriculture to enjoin the Commission from acting pursuant to the provisions of the Act and to enjoin the Secretary of Agriculture from receiving, appropriating or distributing any funds from the Pennsylvania Fair Fund.

The complaint, as amended, summarizes certain provisions of the State Harness Racing Act and alleges that the four counties of Cameron, Forest, Fulton[1] and Sullivan have less than 5,000 registered electors; that at an election held on April 26, 1960, in Philadelphia County, 214,630 votes were cast in favor of locating a harness racing plant with pari mutuel betting in the county and that 46,012 votes were cast in opposition thereto; that Article 3 of the Pennsylvania Election Code directs that the county board of elections of each county shall have jurisdiction over the conduct of elections in such county and shall exercise all of the powers granted to it by the Code, including the power to regulate, prescribe and certify petitions for nominations and referenda, and shall perform all duties imposed upon it by the Code; and, finally, that Philadelphia County does not have a county agricultural society or independent agricultural society within the meaning

---

[1] It was later stipulated by the parties that on November 8, 1960, there were registered in Fulton County 5,150 voters.

of the Act. Plaintiffs contended that the Act violates various sections of the Pennsylvania Constitution and Article 3 of the Pennsylvania Election Code, and that the requirement of a favorable vote by a "majority of the electorate of the county in which the racing plant is located" means a majority of the qualified electors and not merely a majority of such as actually voted at the election. If this latter contention is correct, the favorable vote in Philadelphia County would not qualify it as a location for a racing plant.

The preliminary objections in the nature of a demurrer to the complaint, which were filed by the Attorney General, affirmed the constitutionality of the Act and that the favorable vote in Philadelphia County constituted "a majority of the electorate of the County" within the meaning and intent of the Act. All of the facts averred in the complaint were admitted by the defendants and it was further stipulated by all parties that the hearing and argument, which was had on the preliminary objections, should be deemed a final hearing. Thereafter, the court entered the decree nisi, to which reference has already been made, sustaining the preliminary objections of the defendants and dismissing the complaint. It was stipulated by the parties that the argument of the exceptions filed by the plaintiffs to the decree nisi and briefs thereon be waived. Notwithstanding the stipulation, the court en banc considered the exceptions and dismissed them and made the decree nisi absolute and final by decree entered on November 14, 1960.

The appellants assign as error the action of the court below in holding (1) that the Act, and in particular section 20(b) thereof, does not constitute a local or special law regulating the affairs of counties or granting special or exclusive privileges in violation of Article III, §7, of the Pennsylvania Constitution, (2) that the Act does not create a local or special law

granting special or exclusive privileges or immunities in violation of Article III, §7, of the Pennsylvania Constitution, (3) that the Act does not provide for appropriations for charitable, educational or benevolent purposes in a manner violative of Article III, §18, of the Pennsylvania Constitution, and (4) that the vote in Philadelphia County constitutes a "majority of the electorate" within the meaning and intent of section 20(a) of the Act.

The appellants' assignments of error are overruled and the decree affirmed on the following numbered conclusions as supported by excerpts from the opinion for the court below, to which nothing need be added:

### 1.

*Section 20(b) of the State Harness Racing Act does not constitute a local or special law regulating the affairs of counties or granting special or exclusive privileges in violation of Article III, §7, of the Pennsylvania Constitution.*

"Since the Harness Racing Act, in section 20, requires a petition to be signed by at least 5000 registered electors, before the subject of harness racing under the act shall be submitted to the voters, the plaintiffs argue that the act is not uniform in its application. We think this is an untenable position. It ignores completely the question of classification. Nothing in the Harness Racing Act prevents such counties from becoming members of the class having more than 5000 registered voters. All that is required is that their population and registered electors increase to the required minimum number. Such a classification is not lacking in uniformity. Indeed this section of the constitution recognizes classification as to cities . . . It also sanctions local option as to the use of voting machines, such as the Harness Racing Act authorizes local option as to racing.

"In Kerns v. Kane, 363 Pa. 276, at page 285, the court stated: 'To be uniform in the constitutional sense, such a law must treat all persons in the same circumstances alike.'

"In Smith case, 381 Pa. 223, 233, the Supreme Court, speaking through former Chief Justice HORACE STERN, made the following comment: 'It is, however, too well established to require extended discussion or citation of authorities that all the Constitution demands is that the basis for classification be reasonable and founded upon a genuine and not merely artificial distinction, the test being, not wisdom, but good faith in the classification.'

"This substantially is what was said in Loomis v. Philadelphia School District, etc., 376 Pa. 428: 'Nothing but a clear violation of the Constitution will justify the judiciary in nullifying a legislative enactment. Every presumption must be indulged in its favor, and one who claims an Act is unconstitutional has a very heavy burden of proof. . . . When a statute is challenged as prohibited special legislation, the reasonableness of the classification made is for the Legislature in the first instance; the duty of the court is limited to considering whether the Legislature had any reasonable ground for making it.' (p. 431)

"Article 3, §7, of the Constitution of Pennsylvania provides, inter alia: 'The General Assembly shall not pass any local or special law: . . . Regulating the affairs of counties, cities, townships, wards, boroughs or school districts: . . . For the opening and conducting of elections, or fixing or changing the place of voting.'

"In general, a special law is the opposite of a general law. A special law is not uniform throughout the state or as applied to a class. A general law is. It is well known that the Legislature has classified cities and counties. A law dealing with all cities or all counties of the same class is not a local or special law, but

a general law, uniform in its application. See Roum-
ford Co. v. Delaney, 230 Pa. 374, at pages 377, 378. But
a law dealing with but one county of a class consisting
of ten, would be local or special. This is what is in-
terdicted by Art. 3, Sec. 7. . . .

"Section 16, of the State Harness Racing Act pro-
vides, inter alia, that a portion of the proceeds received
by the state from pari-mutuel betting shall go to the
Secretary of Agriculture and be by him applied to the
promotion of the activities of county agricultural so-
cieties and independent agricultural societies. Since
Philadelphia has no such societies, it would receive no
benefits. It is argued that this is discrimination.

"The promotion of agriculture has long been of
primary concern to the state. Both this state and the
Federal government, and doubtless many other states,
have departments of agriculture whose concern it is
to promote agriculture. One way of doing that is to
benefit agricultural societies. This again is a type of
classification. It benefits Philadelphia County indi-
rectly, whether it has an agricultural society or not.
And since it is a classification, all Philadelphia Coun-
ty needs to do to share the benefits is to get in the
beneficial class by forming an agricultural society. The
choice is entirely its own. We scarcely think we need
add to these comments."

## 2.

*The Act does not create a local or special law grant-
ing special or exclusive privileges or immunities in
violation of Article III, §7, of the Pennsylvania Con-
stitution.*

"This Article reads: 'The General Assembly shall
not pass any local or special law: . . . Granting to any
corporation, association or individual any special or
exclusive privilege or immunity . . .'

"The plaintiffs contend that the Harness Racing
Act grants special and exclusive privileges to the li-

censees under the Act. We think this position is not sound.

"First, the act is not a local or special law as we have previously discussed. Second, no license may be granted unless the local electors so decide—a form of local option. Third, the act is based upon a legislative classification and all members of the licensed class are treated alike. Fourth, the number of licenses may be limited in the exercise of the police power of the state.

"In a sense, all corporations enjoy privileges not enjoyed by the citizens at large. Local option is clearly recognized by this state with reference to the sale of beer and liquor. And, in the same connection the quota system exists, determining how many licenses may be issued. The Public Utility Commission determines to whom a certificate of public convenience shall be issued."

### 3.

*The Act does not provide for appropriations for charitable, educational or benevolent purposes in a manner violative of Article III, §18, of the Pennsylvania Constitution.*

"This section of the Constitution provides in part as follows: 'No appropriations shall be made for charitable, educational or benevolent purposes to any person or community or to any denominational and sectarian institution, corporation or association (with a proviso) . . .'

"The plaintiffs contend that Section 16 of the Act already discussed also violates this provision of the constitution. It is our opinion that this is not an appropriation within the meaning of the Constitution and that our Supreme Court has already established an equivalent precedent. In Dufour v. Maize, 358 Pa. 309, the Supreme Court had before it the Bituminous Coal Open Pit Conservation Act. This Act provided that moneys received by the Secretary of Mines from regis-

tration fees, from forfeited bonds, &c., should be held by the State Treasurer in a special fund to be used by the Secretary of Forests and Waters for the purpose of foresting or reclaiming land affected by open pit mining. It was there contended that this proviso violated Art. 3, §18 of the Constitution just as the argument is made in the instant case. The court disposed of this argument by stating, at page 318: '. . . This disposition of the funds received in administering the Act is not an appropriation within the meaning of Article III, Section 18. In Commonwealth ex rel. Bell v. Powell, 249 Pa. 144, 94 A. 746, it was contended that the disposition of motor vehicle registration and license fees pursuant to the Act of July 7, 1913, P. L. 672, was an appropriation within Article III, Section 18, but the contention was rejected. What was then said of that disposition of the registration and license fees is applicable now. "It (the same constitutional provision) has no application to a fund created for a special purpose and dedicated by the act under which such fund is to be created to a particular use." '

"Since this is almost precisely in point, we think the quotation of further authorities is unnecessary."

4.

*The vote in Philadelphia County was a "majority of the electorate" within the meaning and intent of Section 20(a) of the Act.*

"Section 20 of the Act reads in part as follows: '(a) The Commission shall not consider an application for a license . . . until a majority of the electorate . . . shall have voted in favor of (such racing) . . . .'

"The term elector has several meanings. It may mean one entitled to vote; one who has the right to vote; one having constitutional and statutory qualifications that enable or entitle him to vote. It is sometimes used as synonymous with voter. See Webster's Dictionary; Bouvier's Law Dictionary; 18 American Jurisprudence, page 209, Sec. 43.

"It seems to be true that in the majority of jurisdictions a proposition submitted to the voters need be approved by only a majority of those voting thereon, unless the law expressly or impliedly provides otherwise. Those who fail to vote are presumed to consent, 131 A.L.R. 1383. The older cases stress the inability to determine the number of electors as distinguished from voters. This may not be such a cogent reason now that we have registration of those entitled to vote. But more recently, it has been stressed that no way has been devised to compel people to vote. Many elections, particularly primaries, are determined by less than fifty per cent of the registered vote. In addition, under our form of government the majority prevails, and those unable or unwilling to vote must be bound by the vote cast.

"It is of course obvious, that if a statute requires otherwise, this rule would not prevail. Thus, if three-fourths of the vote cast be necessary for approval, a majority of less than three-fourths would be insufficient.

"We believe that Pennsylvania is in accord with the general rule enunciated above. The most recent pronouncement of our Supreme Court is Munce v. O'Hara, 340 Pa. 209 (1940). On page 211 it is said: '. . . the great weight of authority holds that where a statute provides for a vote of "a majority of the voters", "a majority of the legal voters," "a majority of the qualified voters", etc., all that is required is a majority of those actually voting, unless a contrary legislative intention and purpose is very clearly expressed. . . . In accordance with the general rule are our own decisions touching upon the subject. . . .'

"The court then referred to Craig v. First Presbyterian Church, 88 Pa. 42. Here the law required the approval of a *majority of the members* for the removal of bodies from a burial ground. It was held that all

that was required was a majority of those present and voting.

"The court likewise referred to Schlichter v. Keiter, 156 Pa. 119. There a church constitution provided that it could be amended with the approval of *two-thirds of the whole society*. It was held that a majority of the whole number of persons voting was all that was necessary.

"What the Supreme Court really decided in the Munce case was what vote was required to discontinue the use of voting machines. The statute provides that this could be done by *a majority vote of its qualified electors* cast at any general election. It was held, reversing the lower court, that all that was required was a majority of the votes cast upon the proposition.

"It is our opinion that under the law of Pennsylvania, a majority of the vote cast in Philadelphia is all that the statute requires and that the proposition here involved was carried by a majority of the vote of the electors."

Decree affirmed at appellants' costs.