Lawrence R. Stoltz, Honorable James H. J. Tate, Honorable Joseph Tracy and Harold E. Kohn, Appellants *v.* James C. McConnon, William R. Eaton and Joseph T. Mack, Appellees. (2 Cases)

Southeastern Pennsylvania Transportation Authority and Lawrence H. Baberick, Bernard L. McDevitt, Thomas C. Ottey, Edward J. Roach, William C. Schuster, William E. Shirley, Charles F. Toewe, Francis G. Warburton and Main LaFrentz & Co., t/a Main LaFrentz & Co. *v.* Harold E. Kohn, Appellant.

Argued April 8, 1976, before President Judge Bow-
MAN and Judges CRUMLISH, JR., KRAMER, WILKINSON,
JR., MENCER, ROGERS and BLATT.

*Harold E. Kohn,* with him *Robert A. Swift,* and
*Kohn, Savett, Marion & Graf, P.C.,* for appellants.

*Lewis H. Van Dusen, Jr.,* with him *Edward M. Posner,* for appellees.

Opinion by Judge Rogers, August 11, 1976:

When members of bodies politic charged with conducting essential public services fall out among themselves, the litigation which it seems must inevitably follow always has two features in common with all other such political contests at law. The first is a surfeit of lawsuits intended, no doubt, to demonstrate the magnitude and sincerity of each faction's outrage at the alleged falsity, if not wickedness, of the other's actions. The second common characteristic of this kind of litigation is that the principal issue raised by the excess of actions, if not always easy to decide, is invariably simple.

The public body here involved is the Southeastern Pennsylvania Transportation Authority. SEPTA, as this Authority is known, was created by the Counties of Bucks, Chester, Delaware and Montgomery and the City of Philadelphia by allowance of the Metropolitan Transportation Authorities Act of 1963, Act of August 14, 1963, P.L. 984, *as amended,* 66 P.S. §2001 et seq., hereinafter referred to as MTAA. The name given to this piece of legislation is something of a misnomer, because the Act permits the creation of only one Authority. The territory in which an Authority created may operate is expressly limited to that described by the boundaries of a County of the First Class and all other counties located within twenty miles of such First Class County. Philadelphia is the Commonwealth's only County of the First Class and Bucks, Chester, Delaware and Montgomery Counties are the only municipalities within twenty miles of Philadelphia.

MTAA was an outgrowth of the earlier, highly effective and most amicably executed compact or writ-

ten agreement entered into among Bucks, Chester, Montgomery and Philadelphia Counties called SEPACT. Under and by means of SEPACT, the constituent counties contributed their own money and obtained larger sums by grant of the Federal government which enabled it to prevent the shutdown of the railway commuter lines in the Philadelphia area whose financially distressed owners, the Pennsylvania and the Reading Railroad Companies, could no longer stand the enormous and continuous losses from those operations.

All persons concerned with SEPACT, including especially their sponsors, the elected officials of the municipalities involved of which the then Mayor of Philadelphia was a leader, became convinced that Philadelphia and the suburban counties needed an Authority created by the Legislature and vested by the Legislature with the duty and power to acquire and operate an integrated transit system consisting of the suburban commuter trains, the City's subway[1] and the bus, trolley and other transit facilities of the privately owned Philadelphia Transit Company then operating in the City. The adoption of the MTAA and the creation of SEPTA followed.

SEPTA performed its stated missions admirably. The Philadelphia Transit Company's properties, and those of a large trolley and bus company operating in Delaware County, were acquired and all important mass transit facilities in the five municipalities were placed in SEPTA's charge and operation.

For reasons which do not appear on this record, but which, as all other current municipal problems, no doubt have their origin in financial stringency, the good will among members of SEPTA's Board has dissipated.

---

[1] Then leased for operation to the Philadelphia Transit Company.

The Board, as the MTAA prescribes, has eleven members, one appointed by the Governor of Pennsylvania, and the remaining appointed, two each, by the Commissioners of four of the constituent counties of Bucks, Chester, Delaware, Montgomery, and by the Mayor of Philadelphia.

At a meeting of the Authority held November 27, 1974 two resolutions were moved, one amending the tentative operating budget for the calendar year 1975 and the other adopting the operating budget for the "City Transit Divisions and the Red Arrow Division and the 12th Street offices." Upon the call of the question, ten members being present, five voted yes, four no and one abstained. The Chairman declared the motion carried over the objections of member Harold E. Kohn, Esq., the Governor's appointee.

At a meeting of the Board held December 18, 1974 and at a time when nine members were present five resolutions were moved and upon call of the question five members voted yes and four no. The Chairman declared the resolutions carried. These five resolutions would have (1) authorized payment of bills for counsel fees to two law firms amounting in the aggregate to about $8500, (2) named Main Lafrentz & Co., accountants, to make certain apparently routine audits, and (3) (4) and (5) authorized the General Manager to submit in behalf of SEPTA applications for certain federal grants.

At another time during the meeting of December 18, 1974 when all eleven members were present the following resolution was moved, received seven yes and four no votes and was declared carried:

"Now, therefore, Be It Resolved that the Septa Board recognizes that the tentative operating budget submitted to all members of the Septa Board on September 27, 1974, or approved by its Budget Committee, and as amended on November 27, 1974, was adopted

as the Septa operating budget for the calendar year 1975 and confirms and ratifies that said tentative operating budget is the Septa operating budget for the calendar year 1975."

At a meeting held January 22, 1975, a further resolution authorizing payment to SEPTA's two legal advisors of fees amounting in the aggregate to about $17,000 was declared adopted after a vote of five yes and four no.

The events just described impelled the voting minority on each of the nine resolutions declared adopted at the three meetings, consisting of Mr. Kohn, Lawrence E. Stoltz and James H. J. Tate, Philadelphia's two members, and Joseph Tracy, a Bucks County appointee, to bring original equity actions in both the Court of Common Pleas of Philadelphia County and in this Court against SEPTA's Chairman, its General Manager and its Treasurer. The plaintiffs sought an order setting all of the mentioned resolutions aside, declaring the 1975 budget invalid because unadopted, and that a money judgment be entered against the defendants for their alleged malfeasance and misfeasance in implementing that budget. SEPTA and Main Lafrentz & Co. filed a petition for a declaratory judgment in this Court against Mr. Kohn seeking an order declaring the several resolutions adopted December 18, 1974 to have been effectively adopted.

The procedural history of these three suits is fully described in President Judge BOWMAN's opinion in *SEPTA v. Kohn*, 18 Pa. Commonwealth Ct. 546, 336 A.2d 904 (1975), where we held that this Court had original jurisdiction of none of the actions and that the Court of Common Pleas of Philadelphia County had original jurisdiction of all. On transfer, the suits were consolidated for trial below before Judge JAMES R. CAVANAUGH, one of a panel appointed by the Presi-

dent Judge of the Court of Common Pleas, the other members being Judges G. FRED DiBona and VICTOR J. DiNUBILE, who with Judge CAVANAUGH heard and disposed of exceptions of both parties.

The issue on which the parties differ is simply that of how many votes are needed to carry a resolution of SEPTA's Board of Directors. Mr. Kohn and his fellow plaintiffs in the equity suits say that five are not enough, that MTAA requires six affirmative votes for the passage of any resolution. At long last in this opinion we reproduce Section 18(a) of the MTAA, 66 P.S. §2018(a), which deals with the subject, we think, in controlling fashion:

"Regular meetings of the board shall be held in the metropolitan area at least once in each calendar month except July or August, the time and place of such meetings to be fixed by the board. A majority of the board shall constitute a quorum for the transaction of business. All action of the board shall be by resolution and *the affirmative vote of a majority of all the members shall be necessary for the adoption of any resolution*: Provided, however, That no action by the board to which an express objection has been made, pursuant to this section, by a board member or members representing a county or counties having one-third or more of the population of the metropolitan area, as determined by the most recent decennial census, shall be carried unless supported at a subsequent regular meeting of the board by the votes of at least three-quarters of the membership of the board. In case of disagreement between members representing the same county, each member shall be deemed to represent one-half of the population of that county." (Emphasis supplied.)

To the legislation, we add at this point SEPTA's interpretation of Section 18(a) pertinent to the matter

before the court, by reproducing its by-law 3.07, as follows:

"Except as otherwise provided in Section 18(a) of the Metropolitan Transportation Authorities Act of 1963, all action of the Board shall be by resolution and the *affirmative vote of a majority of all the members of the Board* shall be necessary for the adoption of any resolution." (Emphasis supplied.)

Thus the statute provides that all action of the board shall be by resolution and the affirmative vote of a majority of all the members shall be necessary for the adoption of any resolution. Further, SEPTA's Board by crystal clear expression in its own unanimously adopted interpretation of the statute requires the "affirmative vote of a majority of all the members of the Board."

Judge CAVANAUGH nevertheless, accepting arguments of the defendants, appellees herein, held that a so-called common law rule should apply. That rule is to the effect that, unless the statute clearly expresses a different intention, the assent of the mere majority of a quorum of a meeting is sufficient to carry a motion. Judge CAVANAUGH and his fellow panel judges seemed to have considered Section 18(a) and SEPTA's pre-litigation by-law interpretation of Section 18(a) as not clearly expressing the Legislature's intention that a majority of all of SEPTA's members must affirmatively assent to its resolutions. We respectfully disagree.

We have read the authorities cited by Judge CAVANAUGH, his judicial colleagues and the parties in respect to all of that scholarship and perhaps unnecessarily record our version of this learning.

The origin of the proposition that a majority of those voting, providing a quorum is present, can pass a resolution can be traced to the common law case of *Oldknow v. Wainwright,* 2 Burrows 1017, 97 Eng. Rep.

683 (1760). Several Pennsylvania cases have adopted the common law rule. In cases dealing with large bodies or bodies of indefinite number, there is no quorum rule and a majority of those voting may validly enact a resolution. *Heuchert v. State Harness Racing Commission,* 403 Pa. 440, 170 A.2d 332 (1961); *Munce v. O'Hara,* 340 Pa. 209, 16 A.2d 532 (1940); *Stryjewski v. Panfil,* 269 Pa. 568, 112 A. 764 (1921); *Schlichter v. Keiter,* 156 Pa. 119, 27 A. 45 (1893); *Craig v. First Presbyterian Church,* 88 Pa. 42 (1878). In smaller bodies, a majority of the members must be present for a quorum and a majority of those present may validly enact a resolution. *Meixell v. Hellertown Borough Council,* 370 Pa. 420, 88 A.2d 594 (1952); *Commonwealth ex rel. Fortney v. Wozney,* 326 Pa. 494, 192 A. 648 (1937); *Commonwealth v. Fleming,* 23 Pa. Superior Ct. 404 (1903). The reason for the common law and parliamentary rule is well stated in *Meixell, supra,* where the court stated:

"[I]f such a contention were to prevail [requiring a majority of all members], one or a relatively few persons could, by their intentional absence from, or by their presence at a meeting and their failure to vote, or their casting a blank or illegal ballot, block indefinitely an important election or important legislation and thus paralyze government with obviously great harm to the public interest." 370 Pa. at 425, 88 A.2d at 596.

In *Munce v. O'Hara, supra,* the court held that a majority of these voting would validate an election "unless a contrary legislative intention and purpose is very clearly expressed." 340 Pa. at 211, 16 A.2d at 533. In *Craig v. First Presbyterian Church, supra,* the court stated:

"Had it been intended to require the assent of a majority of *all* the members, whether present at the meeting or not, such intention might and probably

would have been expressed clearly in the act." 88
Pa. at 48. (Emphasis in original.)

The issue remains, however, whether or not the
language contained in Section 18(a), "the affirmative
vote of a majority of all the members," interpreted
by SEPTA itself as requiring the "affirmative vote
of a majority of all the members of the Board," clear-
ly expresses an intention that the so-called common
law rule should not apply. It seems clear to us that
it does.

The lower court's error lay, in our opinion, in its
failing to consider what SEPTA is, how it was con-
stituted and what it was supposed to do, all matters
which distinguish this case from the church congrega-
tion, election, and municipal council cases from which
the so-called common rule derived and with which all
of the Pennsylvania cases are concerned. MTAA au-
thorized the creation only of that organization called
SEPTA—a jointure of five municipalities consisting
of a City of 2,002,512,[2] Delaware County with a popu-
lation of 533,154, Montgomery with 516,682, Bucks
308,567 and finally Chester County with a population
of only 210,608. Other problems existing between and
among the subjects of this nobly concerned amalgama-
tion of these so diverse constituencies were their dif-
ferent need for public transportation, the differences
in the type of mass transit needed by each, the cost
of facilities to be supplied to the several members, the
amount each municipality was able to supply by gen-
eral appropriation for costs, which members should
pay for the acquisition of existing privately owned
systems operating in, or partially in, their municipali-
ties and other sensitive and controversial matters too
numerous now to mention or completely recall. To

---

[2] All figures are from the 1960 census. 1970 census figures show
significant growth in the suburbs and loss of population in the City.

any of the constituent municipalities, the Board's decision on any of these matters could have and have had enormous consequences. The Legislature surely knew this and in drafting and adopting Section 18(a) tried to provide protection for all of the constituent members. Hence, *all* of 18(a) must be read in the light of the kind of representative body being created and the great effect its decisions would have in the five municipalities.

Reading the whole of 18(a), we find that representatives of municipalities having populations equal to one-third of the population of all of the constituent members may veto a resolution adopted by SEPTA and that this veto may not be overridden except by the vote of three-fourths of the membership of the board—or eight members. This provision was, of course, intended to protect Philadelphia which had generously agreed to equal representation with the less populated counties. The requirement of six affirmative votes to adopt resolutions, we believe was intended to protect members not given this right of veto.[3] These municipalities were afforded the protection of the requirement that at least six votes be recorded for any resolution they opposed and in particular, in the case of the two smallest counties, that at least one vote against them would have to come from each of the other of the three municipalities. Section 18(a) was a sophisticated attempt to accomplish voting fairness to the diverse interests, capabilities and transit requirements of all its members. Section 18(a) means in our judgment what it clearly says, as its by-laws agree, that six affirmative votes are required to adopt any resolution.

On facts very similar to the instant case, the New Jersey Supreme Court decided that the following lan-

---

[3] Of course, Philadelphia was and remains the only municipality with the power of veto.

guage adequately reflected a legislative intent to modify the common law rule:

"A majority of all the members of the municipal council shall constitute a quorum, and the affirmative vote of a majority of all the members shall be necessary to take any action or pass any measure, except as otherwise provided in this act."

Even though similar statutory language had already received both judicial and legislative interpretation consistent with the ultimate resolution of the New Jersey case, the Court stated:

"It is fairly to be presumed that, in the use of the phrase 'a majority of all the members' of the councilmatic body, both in relation to the number constituting a quorum and in prescribing the requisites of valid action, the legislative concept was the full membership commanded by the act, and not a reduced body, however occurring." *Ross v. Miller,* 115 N.J.L. 61, 178 A. 771, 772 (1935).

If such a result is properly reached by our neighboring state which then followed the rule that statutes in derogation of the common law must be strictly construed, it follows, *a fortiori,* under Section 1928 of the Statutory Construction Act of 1972, 1 Pa.C.S. §1928, (which abolished the rule of strict construction of statutes departing from common law), that the Legislature meant what it said when in the MTAA it required the affirmatve vote of a majority of all of the board.

Judge CAVANAUGH, in addition to holding that a majority of the quorum though less than a majority of all the members might pass resolutions, further held that an abstention by a member present should be recorded as a vote against the motion. The lower court en banc affirmed Judge CAVANAUGH's decree nisi but concluded that an abstention was neither a vote for nor against the resolution. As Mr. Kohn and his fellow appellants point out, the en banc court's decision

could result in a resolution of this important Board being adopted by one vote. We agree with Judge CAVANAUGH that an abstention is not the affirmative vote for a resolution required by Section 18(a). Since we hold that there must be six yes (or affirmative votes) for the adoption of all resolutions, further discussion of the subject of abstentions is unnecessary.

Although this opinion is already long, we must now retrace our steps to the complaints in equity. Count II says that the 1975 tentative budget was never passed and Count IV charges malfeasance and misfeasance by the defendants, officers of SEPTA, in implementing that budget and money damages. It will be recalled that the original budget resolutions received a five to four vote on November 27, 1974 and that we have set forth in this opinion the full text of a resolution on the same subject matter passed by a vote of seven to four on December 18, 1974. The latter resolution explicitly ratified what had been done in November and in our opinion implicitly, at least, adopted the tentative budget which was the subject of voting on both occasions. The appellants' arguments that the December 18, 1974 votes were somehow ineffective are too subtle for our understanding and are rejected. Since the budget resolution was duly passed on December 18, 1974, any action taken by the officers implementing it could not be wrongful.

We therefore make the following

### ORDER

We affirm the lower court's judgment dismissing the appellants' complaints with regard to the tentative budget for 1975, being the resolution described in paragraph 9, Count II of the complaint filed in the Commonwealth Court, and we affirm the lower court's judgment of dismissal of Count IV of the appellants' said complaint seeking damages against the defend-

ants for malfeasance and misfeasance in office for the cause there alleged.

We reverse the lower court's order upholding the six resolutions which received only five affirmative votes, instead of the six we believe are required, at the December 18, 1974 and January 22, 1975 meetings (the five resolutions recorded in paragraph 4 of Count I and the resolution described in paragraph 18 of Count III of the Complaint filed in Commonwealth Court). The plaintiffs' said complaints at the places indicated seek orders enjoining the defendants from carrying out any of these resolutions, including the payment of any sums of money authorized thereby. Although preliminary relief was requested by the plaintiffs in the equity actions, we cannot find that such was granted and we do not know what SEPTA may have done concerning the resolutions in question since late 1974. We do know that distinguished counsel whose bills are in question have on numerous occasions, including some in this Court, performed outstanding work for SEPTA. We do not know whether the routine audit authorized to be done by Main Lafrentz & Co. has been accomplished or whether the federal grants have been applied for or received or are being now implemented. Although we might regret the injustice of nonpayment of proper bills of persons who performed services for SEPTA in good faith or SEPTA's misfortune in losing federal grants, we must and will apply the law, as we find it to be.

We do therefore hereby enjoin the implementation or carrying out of the six resolutions mentioned in the paragraph immediately preceding or the disbursement of any moneys not already disbursed pursuant thereto.

In regard to the Petition for Declaratory Judgment which the court below seems not to have disposed of explicitly, we do hereby dismiss the same and deny the petitioners', SEPTA and Main Lafrentz & Co.,

prayer for relief and enter judgment thereon in favor of the respondent and against the petitioners.

---

CONCURRING AND DISSENTING OPINION BY JUDGE WILKINSON:

I must respectfully dissent from that part of the majority's decision which holds that it takes 6 affirmative votes for the SEPTA Board to pass any resolution. I cannot agree that by the adoption of Section 18(a) of the MTAA, 66 P.S. §2018(a) the Legislature manifested a clear intention to change the well established common law rule that a majority of those voting, when a quorum is present, passes a resolution and constitutes the action of the body. As set forth in the majority opinion, the precise language of Section 18(a) used in other legislation in Pennsylvania consistently has been held not to change the common law rule. Indeed, this will be the first case to deviate from it. As examples, in 1961, a unanimous Pennsylvania Supreme Court held that the legislative language "majority of the electorate of the county shall have voted in favor" meant a majority of the electorate who voted on the proposition. Those members of the electorate who were "present" in that they were at the polls and voted on other matters, but not on this issue, *i.e.*, abstained, were not counted to determine the majority of the electorate who voted in favor. *Heuchert v. State Harness Racing Commission*, 403 Pa. 440, 170 A.2d 332 (1961). Again, in 1940, a unanimous Pennsylvania Supreme Court held that the legislative language "by a majority vote of its qualified electors cast at any general election" means a majority of its qualified electors "present" in that they are at the polls *and* voting on this issue. *Munce v. O'Hara*, 340 Pa. 209, 16 A.2d 532 (1940). As early as 1878, the legislative language "majority of the members of such society or church" means a majority of those present

at a properly called meeting. *Craig v. First Presbyterian Church,* 88 Pa. 42 (1878).

The majority attempts to justify reversing the able court below and diverting from this long line of Pennsylvania cases by deciding that the lower court failed to consider the nature of SEPTA as a relatively small legislatively created body as distinguished from a church congregation, public elections and municipal council cases and, therefore, the rule should not apply. I prefer the decision of a unanimous Supreme Court of the United States in *Federal Trade Commission v. Flotill Products, Inc.,* 389 U.S. 179, 19 L.Ed. 2d 398, 88 S. Ct. 401 (1967). In that case the five members of the TRC heard argument. Thereafter, two members retired. A new member was appointed, but disqualified himself. A cease and desist order was entered by a vote of two to one. Mr. Justice BRENNAN, speaking for a unanimous court, upheld the action on the basis of the common law rule:

"[T]hat is, in the absence of a contrary statutory provision, a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body." 389 U.S. 179, 183, 19 L.Ed. 2d 398, 402, 88 S. Ct. 401 (1967). (Citing many cases and law review articles).

It seems to me that all of the arguments of the majority apply with greater force to the FTC, having heard an argument, than to SEPTA, but were here rejected by the United States Supreme Court.

I do not believe that SEPTA, by adopting a by-law that says "affirmative vote of a majority of all the members of the Board," has added anything with regard to the problem of the meaning of the legislative language "affirmative vote of a majority of all the members." The issue and the matter to be made clear is whether the "members" or the "members of the Board" means those members or members of the

Board that are present and voting. Manifestly, both the legislation and the by-laws are silent on this critical point, thus bringing the common law rule into play.

It is interesting to observe that the Legislature, in the same section when referring to the vote of the SEPTA Board necessary to overrule a "veto" says "votes of at least three-quarters of the membership of the Board." Also, in setting forth the number of Board members necessary for the issuance of a certificate of incorporation, Section 4(b), 66 P.S. §2004 (b) provides for "a majority of the total number of board members appropriate to any metropolitan area." We might also ask what was the legislative necessity for providing a quorum of six in order for the Board to act if at the same time it was provided that six votes were necessary to pass a resolution. Under such circumstances a provision for a quorum is surplusage whereas under the interpretation I would put on it the requirement of six for a quorum has meaning.

I agree with the majority of the court below that the abstentions are not counted in determining a majority as distinguished from counting them as negative votes. I think the Pennsylvania Supreme Court put that matter to rest in *Meixell v. Hellertown Borough Council,* 370 Pa. 420, 425, 88 A.2d 594, 596 (1952) quoted in the majority but requoted here for emphasis:

"[I]f such a contention were to prevail [requiring a majority of all members], one or a relatively few persons could, by their intentional absence from, or by their presence at a meeting and their failure to vote, or their casting a blank or illegal ballot, block indefinitely an important election or important legislation and thus paralyze government with obviously great harm to the public interest."

I am not impressed by the argument that the adoption of the view that abstentions are just that and are not counted could result in a situation that with a quorum of six, five could abstain and one vote pass a resolution. It can only do so if the five members will it so. If abstentions are votes for anything, it would seem to me that they are votes in favor of the majority of those voting whether affirmative or negative. As stated by Justice PATTERSON in *Munce v. O'Hara*, 340 Pa. 209, 210, 16 A.2d 532 (1940):

"No method having as yet been devised whereby to compel a complete vote by all the voters, the practical working of the elective system necessarily requires that those who abstain from voting be considered as acquiescing in the result declared by a majority of those who exercise the suffrage."

I concur in that part of the decision of the majority set forth in the first paragraph of its Order.

President Judge BOWMAN joins in this concurring and dissenting opinion.