Southeastern Pennsylvania Transportation Authority, Appellant *v.* Max Weiner, Individually and on Behalf of the Consumers Education and Protective Assoc. (CEPA) et al., Appellees.

Argued July 8, 1980, before President Judge CRUMLISH and Judges MACPHAIL and WILLIAMS, JR., sitting as a panel of three. Reargued December 10, 1980, before President Judge CRUMLISH and Judges WILKINSON, JR., MENCER, ROGERS, BLATT, CRAIG, MAC-PHAIL, WILLIAMS, JR. and PALLADINO.

*Raymond K. Denworth, Jr.,* with him, *Lewis H. Van Dusen, Jr., Nancy Sarah Cohen, and James C. Ingram, Drinker, Biddle & Reath,* for appellant.

*George D. Gould,* with him, *John F. Street, David Cohen and Max Weiner,* for appellees.

OPINION BY JUDGE MACPHAIL, February 24, 1981:

On June 25, 1980, the Board of the Southeastern Pennsylvania Transportation Authority (SEPTA) adopted a resolution substantially increasing the fares on its commuter rail and transit divisions. On June 30, 1980, one day before the new tariffs were to go into effect, an action seeking to enjoin the implementation of the resolution was filed by twenty-six persons (Appellees herein) in the Court of Common Pleas of Philadelphia. At 6:00 p.m. on June 30, the Honorable Joseph P. Braig entered an order granting a supersedeas enjoining the collection of the proposed tariff increase. SEPTA appealed immediately to this Court where argument was heard by a specially convened panel on July 8, 1980. A majority of that panel affirmed the order of the Court of Common Pleas of Philadelphia and ordered SEPTA to convene a special meeting of its Board not later than 2:00 p.m. on July 11, 1980.[1] Appellees herein and SEPTA then petitioned the Pennsylvania Supreme Court for a supersedeas whereupon Justices NIX and KAUFFMAN entered an order denying SEPTA's petition and granting a supersedeas to Appellees as to that part of the order of this Court which directed that a special meeting should be held concerning the fare increase.

At the next regular meeting of SEPTA on July 23, 1980, the Board again adopted the fares by a vote of three-fourths of the membership of the Board. By that action the fares became effective July 25, 1980. Notwithstanding the fact that the new fares have come into existence, SEPTA filed an application for rear-

[1] *Weiner v. Southeastern Pennsylvania Transportation Authority,* 56 Pa. Commonwealth Ct. 97, 418 A.2d 776 (1980).

gument with this Court. That application was granted and oral argument was heard by all judges of this Court sitting as a court en banc.

Although Appellees did not raise or argue the question of mootness, it is SEPTA's position that this case has not been rendered moot by the action of SEPTA's Board on July 23, 1980, which action has not been challenged in the courts. SEPTA urges that this is a case of great public importance, that there is a continuing controversy over the proper interpretation of the statute which governs SEPTA's operation[2] and that monetary demands may be made upon SEPTA by virtue of its action in selling transit passes at the higher rate before an injunction was granted. In the past, this Court has held that a technically moot issue may be decided on the merits where a question of important public interest is involved. *Union Electric Contracting Co. Appeal,* 39 Pa. Commonwealth Ct. 584, 396 A.2d 862 (1979) and *Baker Nursing Home, Inc. Appeal,* 28 Pa. Commonwealth Ct. 603, 369 A.2d 1336 (1977). We agree with SEPTA that the issue raised in this particular case is of great public importance and should be resolved to avoid future controversy.

The section of the Act which gives rise to the present controversy is Section 18(a) which reads as follows:[3]

---

[2] Act of August 14, 1963, P.L. 984 (Act), 66 P.S. §2001 et seq. superseded by the Pennsylvania Urban Mass Transportation Law (PUMTL), Act of July 10, 1980, P.L.    , No. 101, 66 P.S. §1971.101 et seq.

[3] This subsection was reenacted *without change* in the PUMTL as Section 319(a), 66 P.S. §1971.319(a). It is significant that the so called "veto" provisions of Section 18(a) were carefully examined at the extensive public hearings held by the House Select Committee to investigate SEPTA prior to the enactment of the PUMTL (report of the House Select Committee to investigate SEPTA, January 22, 1980, pages 69-73 and 77-81).

Regular meetings of the board shall be held in the metropolitan area at least once in each calendar month except July or August, the time and place of such meetings to be fixed by the board. A majority of the board shall constitute a quorum for the transaction of business. All action of the board shall be by resolution and the affirmative vote of a majority of all the members shall be necessary for the adoption of any resolution: Provided, however, That no action by the board to which an express objection has been made, pursuant to this section, by a board member or members representing a county or counties having one-third or more of the population of the metropolitan area, as determined by the most recent decennial census, shall be carried unless supported at a subsequent regular meeting of the board by the votes of at least three-quarters of the membership of the board. In cases of disagreement between members representing the same county, each member shall be deemed to represent one-half of the population of that county.

66 P.S. §2018(a).

SEPTA was created by the counties of Bucks, Chester, Delaware and Montgomery and the City of Philadelphia. The Board consists of eleven members —two from each of the counties and the City of Philadelphia and one appointed by the Governor.

The controversial fare increase before us now was first adopted on June 25, 1980 by a vote of seven to three. The three negative votes were cast by the two Philadelphia representatives and the representative from Delaware County. It has been stipulated that these negative votes would represent at least one-third of the population of the area served by the authority. However, the chairman ruled that the

resolution had been duly adopted. One of Philadelphia's representatives who cast a negative vote stated immediately following the taking of the vote,

The question has been raised whether I voted in pursuant (sic) to the terms of the statute that would allow any combination of votes representing a third of the population of the region to veto a measure before the board. I voted against that resolution because I believe we can do more. *I am not exercising the veto privilege.* (Emphasis added.)

The other representative from Philadelphia and the representative from Delaware County voted "no" without further comment.

It is SEPTA's contention that Section 18(a) requires something more than a negative vote before the provisions mandating another vote at the next Board meeting are invoked. In fact, that interpretation was adopted by SEPTA at its inception and has been the accepted practice ever since. Appellees' contention that a "no" vote is an "express objection" without more was upheld by the trial court and by a majority of the special panel of this Court in its opinion filed July 8, 1980.[4]

Section 1903 of the Statutory Construction Act of 1972, 1 Pa. C. S. §1903 states in pertinent part, "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage. . . ." According to the Random House Dictionary of the English Language (Unabridged, 1973) "express" has many meanings but those pertinent to the issue now before us are: "clearly indicated; distinctly stated; definite; explicit; plain. . . . duly or exactly formed or represented. . . ." "Objection" is defined in the same authoritative source

---

[4] *See* footnote 1 *supra.*

as "1. something said or offered in disagreement, opposition, refusal, or disapproval; *an adverse reason or argument.* 2. the act of objecting. 3. *a ground or cause for objecting.* 4. a feeling of disapproval, dislike, or disagreement." (Emphasis added.) It is our opinion that the common meaning of an "express objection" is something more than raising one's hand or saying "no." There must be some additional verbalization expressed to the Board such as a statement of why one objects. At the very least, it must be clear from what the dissenter says that he or she is objecting pursuant to the provisions of the section of the Act which triggers another meeting and ballot if the requisite population is represented by the objection.

Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa. C.S. §1921(a) states, "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions." A court must assume that the legislature intends every word of the statute to have effect. *Commonwealth v. Driscoll,* 485 Pa. 99, 401 A.2d 312 (1979). Throughout subsection (a) the term "vote" is used in connection with actions of the Board with the single exception of the situation where board members representing one-third of the population make an "express objection . . . pursuant to this section. . . ." If the legislature had intended that negative "votes" were sufficient to require an additional ballot, it would have been very easy to so provide in plain language. Section 18(a) strikes a balance between equal representation among the counties and the City of Philadelphia *and* representation based on population. Were a negative vote interpreted to constitute a "veto" the concept of equal representation—*i.e.* that each county, regardless

of population, is represented by two members of the board, would be dealt a severe blow. Such an interpretation would require that for a resolution to pass there be an affirmative vote of a majority of all board members *and* that the negative votes represent less than one-third of the population. We do not believe that the legislature intended such complex voting considerations. The net result of such an interpretation would be that every proposed action of the Board where the negative votes represented one-third of the population would have to be reconsidered at another meeting whether the proposed action was the approval of the minutes, the purchase of paper clips or a rate increase. In our judgment, such a construction would render ineffective the statutory language that "the affirmative vote of a *majority of the members* shall be necessary for the adoption of *any* resolution." (Emphasis added.) Our interpretation of the disputed language gives effect to all of the provisions of Section 18(a) and, in our opinion, accurately reflects the intention of the legislature.

In *Stoltz v. McConnon*, 26 Pa. Commonwealth Ct. 82, 362 A.2d 1121 (1976) *aff'd* 473 Pa. 157, 373 A.2d 1096 (1977), the issue before this Court was whether the chairman of SEPTA ruled correctly that Board resolutions were adopted by votes of five to four and seven to four, respectively. This Court held that an affirmative vote by a majority of the members of the Board was required to adopt a resolution and that an affirmative vote by a mere majority of the members present at a meeting constituting a quorum of the Board was insufficient. Judge ROGERS, writing for the majority of this Court, said this about Section 18(a):

> Reading the whole of 18(a), we find that representatives of municipalities having popu-

lations equal to one-third of the population of all of the constituent members may *veto* a resolution adopted by SEPTA and that this *veto* may not be overriden except by the vote of three-fourths of the membership of the board —or eight members. This provision was, of course, intended to protect Philadelphia which had generously agreed to equal representation with the less populated counties. The requirement of six affirmative votes to adopt resolutions, we believe was intended to protect members not given this right of *veto*. These municipalities were afforded the protection of the requirement that at least six votes be recorded for any resolution they opposed and in particular, in the case of the two smallest counties, that at least one *vote* against them would have to come from each of the other of the three municipalities. Section 18(a) was a sophisticated attempt to accomplish voting fairness to the diverse interests capabilities and transit requirements of all its members. Section 18(a) means in our judgment what it clearly says, as its by-laws agree, that six affirmative *votes* are required to adopt any resolution. (Emphasis added.)

26 Pa. Commonwealth Ct. at 92, 362 A.2d at 1125 (footnote omitted.) While the specific issue before us now was not before this Court in *Stoltz,* it seems clear from the language we have quoted that *any* resolution could be adopted by an affirmative *vote* of a majority of all the Board members unless it was *vetoed* by the members representing one-third of the population. We now supplement that holding by our decision that a "veto" can be exercised only by an "express objection" made pursuant to the provisions

of Section 18(a) and that a negative vote without more is insufficient to constitute such objection.[5]

Accordingly, we conclude that the trial court erred as a matter of law in holding that the resolution raising fares was not duly adopted at the meeting of SEPTA's Board on June 25, 1980.[6]

### ORDER

AND Now, this 24th day of February, 1981 the order of the Court of Common Pleas of Philadelphia County entered to No. 4787 June Term 1980 on June 30, 1980 is vacated.

---

[5] It follows, of course, that where a Board member is recorded as saying that his negative vote is *not* intended to be an exercise of his veto privilege, the veto privilege has been waived thereby.

[6] We specifically refrain at this time from ruling upon past practices of SEPTA regarding the manner in which the veto may be exercised. The only issue before us in the instant case is whether the resolution was duly adopted by what occurred at the meeting on June 25, 1980 and we hold that it was.

---

DISSENTING OPINION BY PRESIDENT JUDGE CRUMLISH:

This issue simply turns on a Semantic difference. Is the term ''no'' synonymic with the phrase ''express objection'' as written in Section 18(a) of the Pennsylvania Urban Mass Transportation Law, Act of July 10, 1980, P.L. 427, *as amended*, 66 P.S. §1971.319(a). I expressed my opinion following the special panel, hearing *Weiner v. Southeastern Pennsylvania Transportation Authority*, 56 Pa. Commonwealth Ct. 97, 418 A.2d 776 (1980). Now, I must register opposition.

The majority would have us argue that an ''express objection'' for ''veto'' purposes requires something more than a negative vote by representatives

of one-third of the population area served by the Authority. The majority's pedantic definitional interpretation not only serves to complicate a process which should never have been complicated, but makes the subjective intent of voting Board members the crucial issue.

In my opinion, when these three Board members registered "no" votes to the proposed fare increase, they registered an "express objection," regardless of whether one or all sought to qualify their decision. Notwithstanding the City Representative's attempt to qualify his vote as not contemplating a "veto," it remained a mere appendage to the substantive expression of opposition to the proposal. In short, "no" does not mean, "No, but maybe," nor "No, I repeat no."

The majority would also have us agree that to equate a negative vote with a "veto" deals a severe blow to both the concept of equal representation and the Board's operating efficiency. I cannot agree. Clearly, the "veto" provisions were intended by the Legislature "to protect Philadelphia which had generously agreed to equal representation with the less populated counties." Essentially, "Section 18(a) was a sophisticated attempt to accomplish voting fairness to the diverse interests, capabilities and transit requirements of all its members." *Stoltz v. McConnon*, 26 Pa. Commonwealth Ct. 82, 92, 362 A.2d 1121, 1126 (1976), *aff'd* 473 Pa. 157, 167, 373 A.2d 1096, 1100-01 (1977). I can find neither a significant nor alarming reduction in fair representation by requiring a simple "no" vote to fulfill the dictates of an "express objection." In addition, I must surmise that tabulating and interpreting the number of possible vote variations and their respective meanings may well keep both the Board and our Courts in-

volved with even more of this untoward litigation, all of which is the result of someone's failure to enunciate clearly and finally the proper parliamentary procedure.

Judge WILLIAMS, JR., joins in this dissent.