**[J-25-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| LANDLORD SERVICE BUREAU, INC.; MICHELLE WILLIAMS; COLLYER REALTY COMPANY, D/B/A GALASSO REAL ESTATE SERVICES; SANTO POLICICHIO; CROWN REAL ESTATE AND MANAGEMENT SERVICES | : : : : : : : : | No. 15 WAP 2023<br><br>Appeal from the Order of the Commonwealth Court entered March 17, 2023 at No. 1026 CD 2021, Reversing the Order of the Court of Common Pleas of Allegheny County entered August 17, 2021 at No. GD 15-023074. |
| v. | : : | |
| | : | ARGUED:  April 9, 2024 |
| THE CITY OF PITTSBURGH AND COUNCIL OF THE CITY OF PITTSBURGH | : : : | |
| REALTORS ASSOCIATION OF METROPOLITAN PITTSBURGH, A PENNSYLVANIA CORPORATION NOT FOR PROFIT | : : : : : : : | |
| v. | : : : : | |
| THE CITY OF PITTSBURGH | : : | |
| APARTMENT ASSOCIATION OF METROPOLITAN PITTSBURGH, A PENNSYLVANIA CORPORATION NOT FOR PROFIT | : : : : : : : | |
| v. | : : : : | |
| THE CITY OF PITTSBURGH, A HOME RULE CITY | : : : : | |
| APPEAL OF: THE CITY OF PITTSBURGH AND COUNCIL OF THE CITY OF PITTSBURGH | : : : | |

## DISSENTING STATEMENT

**JUSTICE WECHT**                                **DECIDED:  JUNE 18, 2024**

The Majority dismisses this case as moot because the Pittsburgh ordinance that engendered this litigation was displaced during the pendency of this appeal by a new ordinance, rendering any decision we might offer as to the former ordinance advisory.  I agree that the underlying case technically is moot, but I believe nonetheless that we should review this case under the well-established "public-importance" exception[1] to the mootness doctrine.  Accordingly, I respectfully dissent.

This dispute concerns the breadth of the City of Pittsburgh's authority, as a home-rule municipality, to regulate individual and corporate landlords in its residential rental market.  In 2015, the City passed a "Rental of Residential Housing Ordinance" ("the 2015 Ordinance").[2]  It explained the impetus for the ordinance as follows:

> The City of Pittsburgh recognizes the need for a registration program for residential rental units located within the City in order to ensure rental units meet all applicable building, existing structures, fire, health, safety, and zoning codes, and to provide an efficient system for compelling both absentee and local landlords to correct violations and maintain, in proper condition, rental property within the City.  The City recognizes that the most efficient system is the creation of a program requiring the registration of residential rental units within the City as defined in this Chapter, so that an inventory of rental properties and a verification of compliance can be made

---

[1]      Below, I engage in a broader survey of cases around the country, some of which use the language of public *interest* rather than public *importance*.  In discussing those cases, I honor their terminology.  But the terms should be understood as interchangeable for present purposes.

[2]      PITTSBURGH CITY CODE, art. X, ch. 781, §§ 781.00-781.12 (2015).

by City officials.  The City intends to use a portion of the funds generated by the registration fee for property inspection purposes.[3]

In furtherance of its stated goals, the City imposed various obligations upon owners seeking to rent their properties out as residences.  The 2015 Ordinance:

- mandated registration of residential rental units in Pittsburgh;

- provided that no rental unit could be leased, rented, or occupied without a permit from the City and the designation of a "responsible local agent";

- instituted an annual fee for rental permits assessed per unit;

- directed the City's Department of Permits, Licenses, and Inspections ("DPLI") to inspect each registered rental unit periodically;

- directed DPLI to create an online database giving public access to information related to registered properties and their inspections; and

- further directed DPLI to create a "manual of good landlord practices," a "landlord academy," and to provide sundry related, but non-mandatory resources for landlords.

This action arose from the consolidation of suits filed by the Landlord Service Bureau, the Apartment Association of Metropolitan Pittsburgh, and the Realtors Association of Metropolitan Pittsburgh, among others (collectively, "Landlords"), all of which challenged the 2015 Ordinance as violative of the business exclusion to municipal authority granted by the Home Rule Charter and Optional Plans Law ("Home Rule Law").[4] The Home Rule Law provides that "[a] municipality which has adopted a home rule charter

---

[3]     2015 Ordinance § 781.00 ("Purpose and Intent").

[4]     *See* 53 Pa.C.S. §§ 2901-2984.  Home rule finds its provenance in our Constitution, which provides: "Municipalities shall have the right and power to frame and adopt home rule charters. . . .  A municipality which has a home rule charter may exercise any power or perform any function not denied by this Constitution, by its home rule charter or by the General Assembly at any time."  PA. CONST. art. IX, § 2.

may exercise any powers and perform any function not denied by the Constitution of Pennsylvania, by statute or by its home rule charter."[5]

However, the Home Rule Law also imposes numerous limitations upon home-rule authority. At issue in this case is what we call the "business exclusion," which cabins home-rule municipalities' regulation of business activities as follows:

> A municipality which adopts a home rule charter shall not determine duties, responsibilities or requirements placed upon businesses, occupations and employers, including the duty to withhold, remit or report taxes or penalties levied or imposed upon them or upon persons in their employment, except as expressly provided by statutes which are applicable in every part of this Commonwealth or which are applicable to all municipalities or to a class or classes of municipalities. . . .[6]

The question here isn't whether the 2015 Ordinance "determine[s] duties, responsibilities or requirements placed upon businesses." Plainly it does. Rather, as is often the case with business exclusion challenges, the question is whether a particular generally applicable statute or statutes provide the necessary authority to overcome the business exclusion's application.[7] The Allegheny County Court of Common Pleas granted the City judgment on the pleadings in part, concluding that the 2015 Ordinance was a permissible exercise of the City's home-rule authority. On Landlords' appeal, the Commonwealth Court disagreed and threw out the 2015 Ordinance in its entirety, raising the specter that the City's rental market would effectively go unregulated.[8]

---

[5]     53 Pa.C.S. § 2961.

[6]     *Id.* § 2962(f).

[7]     *See Pa. Rest. & Lodging Ass'n v. City of Pittsburgh*, 211 A.3d 810, 823-24 (Pa. 2019) ("*PRLA*").

[8]     *See Landlord Serv. Bureau, Inc. v. City of Pittsburgh*, 291 A.3d 961 (Pa. Cmwlth. 2023).

During the course of this litigation, ostensibly as a hedge against the City's rental market becoming a free-for-all in the absence of any directly governing ordinance, the City enacted in 2023 a much diminished "Residential Housing Rental Permit Program" ("the 2023 Ordinance").[9]  The 2023 Ordinance required rental-unit registration, but dispensed with, *inter alia*, the requirement that landlords appoint a responsible local agent; DPLI's duty to publish information regarding ownership and inspection of rental units to an online database; and other obligations that had engendered most of Landlords' challenges to the 2015 Ordinance.

Meanwhile, the City sought, and this Court granted, our discretionary review.[10]  But now the Majority cites the 2023 Ordinance as having rendered any consideration of the 2015 Ordinance moot and therefore unreviewable.  By the Majority's implication, the City had two choices.  The City could accept the risk that the Commonwealth Court's ruling invalidating the 2015 Ordinance would be upheld, leaving the City with no rental regulation whatsoever—or the City could hedge against that outcome by passing a more limited ordinance that might not incur litigation by Landlords or other local business

---

[9]  *See* PITTSBURGH CITY CODE, art. X, ch. 781, §§ 781.00-781.11 (2023).  Landlords filed their notice of appeal before the Commonwealth Court in this case on September 21, 2021.  The first recorded action on the 2023 Ordinance is its addition to the City Council agenda on April 19, 2022.  The Commonwealth Court issued the decision subject to this appeal on March 17, 2023.  On April 17, 2023, the City filed its Petition for Allowance of Appeal, which we granted in a September 1, 2023 order.  City Council finally passed the 2023 Ordinance on September 26, 2023, during the pendency of this appeal (and amid the Commonwealth Court's adverse ruling), and the Mayor signed it two days later.

[10]  *See Landlord Serv. Bureau, Inc. v. City of Pittsburgh*, 304 A.3d 20 (Pa. 2023) (*per curiam*).

interests. It chose the latter, and now, allegedly, it must be denied review of the 2015 Ordinance.[11]

To be sure, our general approach to mootness is clear: "It is well established in this jurisdiction that this Court will not decide moot questions. . . . [A] legal question can become moot on appeal as a result of an intervening change in the facts of the case."[12] Equally clear is that Pennsylvania courts recognize three circumstances under which technical mootness may be overlooked as a prudential matter: "1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the [lower] court."[13]

---

[11] Surprising no one, the same Apartment Association involved in this suit has filed an equally vigorous lawsuit challenging the 2023 Ordinance, albeit on grounds unrelated to the business exclusion. *See The Apartment Ass'n of Metro. Pittsburgh v. City of Pittsburgh*, GD-23-14270 (CCP Allegheny). That lawsuit appears to be stalled in the pleading stage pending our resolution of this case. The Majority baldly asserts that the new ordinance "does not contain the Rental Ordinance provisions that the Commonwealth Court below found to violate Section 2962(f) of the Home Rule Charter and Optional Plans Law." Order, 6/18/2024, at 2 (*per curiam*). This is true only in the most technical sense, and with respect to the business exclusion issue specifically. But there are substantial commonalities outside the home-rule frame, including asserted constitutional violations pertaining to privacy concerns, equal protection, search and seizure, and impairment of contracts. It is true that the lower court did not reach the parallel constitutional claims in the instant litigation because its ruling stemmed from Section 2962(f), but that is precisely the sort of benefit of resolving this case now, while it has been crystallized and fully argued from one court to the next: were this Court to reject the Commonwealth Court's sweeping Section 2962(f) analysis, the Commonwealth court would be compelled to rule upon Landlords' stand-alone constitutional arguments in this case, perhaps providing the clarity necessary for the trial court to consistently rule upon the newer ordinance.

[12] *In re Gross*, 382 A.2d 116, 119 (Pa. 1978) (citation omitted).

[13] *Burke ex rel. Burke v. Indep. Blue Cross*, 128 A.3d 223 (Pa. Super. 2015) (citations omitted); *see Commonwealth, Dept. of Env't Prot. v. Cromwell Twp.*, 32 A.3d 639, 652 (Pa. 2011) (quoting *Pub. Def.'s Off. of Venango Cnty. v. Venango Cnty. Ct. of Common* (continued…)

As to the "public-importance exception," the Commonwealth Court has explained:

Although rarely invoked, both [the Commonwealth] Court and our Supreme Court applied the public importance exception to permit review in a number of cases. *See, e.g., Jersey Shore Area Sch. Dist. v. Jersey Shore Educ. Ass'n*, 548 A.2d 1202 (Pa. 1988) (involving legality of teachers' strike); *Lutz v. Tanglewood Lakes Cmty. Ass'n, Inc.*, 866 A.2d 471 (Pa. Cmwlth. 2005) (implicating future governance of nonprofit corporations); *In re Gen. Election, Nov. 8, 1988,* 560 A.2d 260 (Pa. Cmwlth. 1989) (involving over 4,700 voters who failed to mail registration applications before deadline); *Mifflin Cnty. Sch. Dist. v. Stewart*, 503 A.2d 1012 (Pa. Cmwlth. 1986) (involving issue of whether expelled student had property right to attend graduation ceremony).[14]

There is plenty to be said for overlooking mootness only sparingly; there is a valid concern for allowing the exceptions to swallow a sound, prudent rule. But our approach to the "case or controversy requirements," including mootness, is prudential rather than jurisdictional,[15] and there also is much to be said for measuring whether to apply mootness exceptions against the particular circumstances, equities, and the broader public interest implicated in a particular case.[16]

---

*Pleas*, 893 A.2d 1275-1279-80 (Pa. 2006)) ("Exceptions to [the mootness doctrine] are made where the conduct complained of is capable of repetition yet likely to evade review, where the case involves issues important to the public interest or where a party will suffer some detriment without the court's decision."). Notably, none of the cases cited by the Majority even acknowledges the existence of these well-established exceptions.

[14] *Salvatore v. Dallastown Area Sch. Dist.*, 995 C.D. 2014, 2015 WL 5162153, at *7 (Pa. Cmwlth. Feb. 20, 2015) (unreported) (citations modified).

[15] *See Firearm Owners Against Crime v. Papenfuse*, 261 A.3d 467, 481-82 (Pa. 2021). The Tennessee Supreme Court usefully has offered the following explanation of the traditional justiciability factors: "While the doctrines of standing and ripeness focus on the suit's birth, the doctrine of mootness focuses attention on the suit's death." *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam County*, 301 S.W.3d 196, 204 (Tenn. 2009) ("*Norma Faye Pyles*").

[16] *See Norma Faye Pyles*, 301 S.W.3d at 204 ("In the absence of an explicit constitutional imperative, decisions to dismiss a case on the ground of mootness require the exercise of judgment based on the facts and circumstances of the case.").

Although this Court and the Commonwealth Court have applied the public-importance exception, neither we nor they have explained in detail *when* it should apply, except by implication. In *Werner v. King*,[17] this Court implicitly applied a public-importance exception to an otherwise moot case. At issue in that case was a question of one act's repeal of another. The earlier, challenged statute imposed advertising requirements that we determined had been displaced during the *Werner* litigation by the new act. We further determined that the controversy was effectively moot, because the objected-to public notice requirements became immaterial to the parties when the notices were published during the litigation. However, we decided the issue anyway, explaining: "Ordinarily [the mootness of the case] would be stated, without more, and the appeal dismissed. We have, however, dealt with the substantial question involved, because it is one which can be raised any year hereafter, when the lists are about to be advertised, unless settled by us."[18]

Turning to the Commonwealth Court, in *SEPTA v. Weiner*,[19] a transit fare increase enacted by the SEPTA board triggered a question pertaining to the veto effect, if any, of certain nay votes by board members. While litigation over that matter was pending, the

---

[17]    164 A. 918 (Pa. 1933).

[18]    *Id.* at 919; *see Jersey Shore Area Sch. Dist.*, 548 A.2d at 1204 (applying public-importance exception to teacher's strike-related litigation); *Maloney v. Dist. No. 1, United Mine Workers of America*, 162 A. 225, 225 (Pa. 1932) ("The question presented by this appeal is moot, but because it involves a large class of citizens, and has been the basis of strife ending in riots and other breaches of the peace, we will determine the primary question involved."); *Pardee v. Schuylkill Cnty.*, 120 A. 139, 140 (Pa. 1923) ("Since the question thus raised is a public one, of great future importance, alike to the various counties and the taxpayers therein, we shall proceed to decide it, although it might be considered moot . . . .").

[19]    426 A.2d 191 (Pa. Cmwlth. 1981).

fare increase was revoked by order of the Commonwealth Court and readopted by SEPTA's board, mooting the original question as it related to the revoked fare increase. Nonetheless, the Commonwealth Court applied the public-importance exception, agreeing with SEPTA that the statutory question was subject to continued dispute that could expose SEPTA to monetary damages.[20]

Notably, none of the foregoing Pennsylvania cases has articulated a detailed test for when to apply the public-importance exception. But other jurisdictions have been more proactive in formalizing their inquiries, and they have much to teach. I find no shortage of such cases,[21] but two in particular rise to the top.

---

[20] *Id.* at 193. *See also Mifflin Cnty. Sch. Dist. v. Stewart*, 503 A.2d 1012, 1013 (Pa. Cmwlth. 1986) (invoking public-importance exception regarding question whether student had property right to participate in graduation ceremony, even though passage of time had mooted the issue). In addition to cases clearly relying upon the public-importance exception, other Pennsylvania cases have invoked it in tandem with the capable of repetition but evading review mootness exception. *See, e.g., Lutz v. Tanglewood Lakes Cmty. Ass'n, Inc.*, 866 A.2d 471, 473 (Pa. Cmwlth. 2005); *In re Gen. Election, Nov. 8, 1988*, 560 A.2d at 453. Some other states combine these tests rather than recognizing them as distinct in the way that Pennsylvania courts generally have and do. *See, e.g., Young v. State*, 502 P.3d 964, 970-71 (Alaska 2022); *Jackson Cnty. Bd. of Election Comm'rs v. City of Lee's Summit*, 277 S.W.3d 740, 745 (Mo. Ct. App. 2008); *cf. City of Cranston v. R.I. Laborers' Dist. Council Local*, 960 A.2d 529, 542-43 (R.I. 2008) (Flaherty, J., dissenting) (criticizing that court for conflating the public-importance and the capable of repetition yet evading review exceptions, and citing jurisdictions that recognize them as distinct).

[21] *See, e.g., Gator.com Corp. v. L.L. Bean, Inc.*, 398 F.3d 1125, 1141-42 (9th Cir. 2005) (Fletcher, J., dissenting) (providing a through discussion of federal mootness jurisprudence, mootness principles generally, and collecting state cases recognizing a public-importance exception); *Witt v. Watkins*, 579 P.2d 1065, 1071 n.19 (Alaska 1978) (collecting state public-importance cases); *State v. Rochon*, 75 So.3d 876, 883-87 (La. 2011) (reviewing federal and state mootness jurisprudence with particular focus on the various applications of the repetition/review and public-importance exceptions); *City of Albuquerque v. Campos*, 525 P.2d 848, 851 (N.M. 1974) (collecting state public-importance cases).

In *Norma Faye Pyles*, the Supreme Court of Tennessee noted that, in exercising its discretion to consider otherwise moot questions of public importance:

> the courts should first address the following threshold considerations: (1) the public interest exception should not be invoked in cases affecting only private rights and claims personal to the parties; (2) the public interest exception should be invoked only with regard to issues of great importance to the public and the administration of justice; (3) the public interest exception should not be invoked if the issue is unlikely to arise in the future; and (4) the public interest exception should not be invoked if the record is inadequate or if the issue has not been effectively addressed in the earlier proceedings.[22]

When a case passes this threshold test, the *Norma Faye Pyles* Court prescribes an interest-balancing test to determine whether its public interest exception should apply:

> [T]he courts should then balance the interests of the parties, the public, and the courts to determine whether the issues in the case are exceptional enough to address. In making this determination, the courts may consider, among other factors, the following: (1) the assistance that a decision on the merits will provide to public officials in the exercise of their duties, (2) the likelihood that the issue will recur under similar conditions regardless of whether the same parties are involved, (3) the degree of urgency in resolving the issue, (4) the costs and difficulties in litigating the issue again, and (5) whether the issue is one of law, a mixed question of law and fact, or heavily fact-dependent.[23]

Nebraska's Supreme Court also applies a multi-factorial test:

> [U]nder the public interest exception, [an appellate court] may review an otherwise moot case if it involves a matter affecting the public interest or when other rights or liabilities may be affected by its determination. And when determining whether a case involves a matter of public interest, [the appellate court] consider[s] (1) the public or private nature of the question presented, (2) the desirability of an authoritative adjudication for future

---

[22]     *Norma Faye Pyles*, 301 S.W.3d at 210-11 (cleaned up).

[23]     *Id.* at 211 (footnotes omitted).

guidance of public officials, and (3) the likelihood of future recurrence of the same or a similar problem.[24]

Notably, Tennessee, like Nebraska, foregrounds the benefit of a decision to the guidance of public officials.[25] And in *Norma Faye Pyles* and elsewhere, courts also have identified as a threshold requirement that the party advocacy and the record are sufficiently well developed to enable review—to which we might add the thoroughness of a lower court's analysis.[26]

There is no question that the case before this Court clears *Norma Faye Pyles*'s threshold conditions. While the landlord's interests are private, and have been provisionally vindicated by the Commonwealth Court, it is the citizenry's very public right to enjoy robust local government to the extent permitted by law that is at issue in this case. As well, the degree to which local municipalities may regulate their rental markets

---

[24] *Evertson v. City of Kimball*, 767 N.W.2d 751, 758 (Neb. 2009) (footnotes omitted); *see In re Interest of Anaya*, 758 N.W.2d 10, 17 (Neb. 2008) (applying public-interest exception to case concerning interaction of religious freedom and parents' decision not to comply with newborn screening statute); *accord Young v. House*, 648 S.W.3d 706 (Ky. Ct. App. 2022) (applying the same three-factor test).

[25] Nor, by any means, are these the only courts to connect the public-importance exception to the guidance of public officials in the public interest: "[a]n appellate court may address an issue despite its mootness when the question considers matters of important public interest. For this exception to apply, the issue must present a question of imperative and manifest urgency requiring the establishment of a rule for future guidance in matters of important public interest." *Croft v. Town of Summerville*, 860 S.E.2d 352, 356-57 (S.C. 2021) (cleaned up); *cf. Yancer v. Kaufman*, 854 N.W.2d 640, 645 (Neb. Ct. App. 2014 ("A review of cases in which the Nebraska Supreme Court has applied the public interest exception leads us to the conclusion that the exception applies where the activity sought to be prohibited is of a public nature."); Note, *Cases Moot on Appeal: A Limit on the Judicial Power*, 103 U. Pa. L. Rev. 772, 790 (1955) (observing that mootness may be overlooked "where the issues could arise throughout the state, as when municipal authority under a state statute is questioned," and citing cases).

[26] *See, e.g., Payne v. Jones*, 146 P.2d 113, 116 (Okla. 1944); Note, *supra* n.25, at 792-93.

is an issue of great importance to the public. This point is reinforced by the manifest mandate to sensibly regulate housing that is embodied in the Municipal Housing Ordinance Authorization Law ("MHOA") as well as by the previous appearance of similar cases in the Commonwealth Court.[27] And if the issue does not arise in the future, it likely will be because the Commonwealth Court's decision has erected such a formidable barrier to similar regulation that legal advisors discourage local legislators from committing the time and legislative energy to a likely futile endeavor. Finally, the questions presented being legal in nature, and mootness having only arisen since the case came before this Court, there is no question that we have the benefit of full consideration below and fully developed advocacy.

As well, and as importantly, whether we apply Tennessee's test, Nebraska's test, or some hybrid of the two, every enumerated factor suggests that the case before us is well-suited to the public-importance exception. A final decision on the matter would provide guidance for potentially hundreds of public officials whose offices and authority it

---

[27]  The MHOA authorizes housing regulations as follows:

> In addition to other remedies provided by law, and in order to promote the public health, safety, morals, and the general welfare, all [cities of the second class, *et al*,] in this Commonwealth are hereby authorized and empowered to enact and enforce suitable ordinances to govern and regulate the construction, alteration, repairs, occupation, maintenance, sanitation, lighting, ventilation, water supply, toilet facilities, drainage, use and inspection of all buildings and housing and to the sanitation and inspection of land appurtenant thereto, and the said ordinances may provide proper penalties not exceeding five hundred dollars ($500) for the violation of their provisions.

53 P.S. § 4101; *see Berwick Area Landlord Ass'n v. Borough of Berwick*, 48 A.3d 524 (Pa. Cmwlth. 2012) (upholding landlord registration ordinance under the municipality's police powers); *McSwain v. Commonwealth*, 520 A.2d 527 (Pa. Cmwlth. 1987) (same as to ordinance requiring housing code inspection before each rental).

affects. To the question of urgency, the instant litigation is in its eighth year, and surely the Commonwealth's municipalities should not have to wait another decade for a final resolution of the important question presented. The duration of the litigation also speaks to its expense, which presumably will recur the next time parties elect to go the distance. The simple fact is that it is the public that benefits most from a decision in this matter, directly and through the clarity it would give local legislators regarding what they may and may not do to oversee and regulate their local rental markets. As this case makes clear, litigating the matter from the initial enactment of an ordinance stringent enough to invite coordinated opposition by landlords to its final consideration before a court of last resort inevitably will be burdensome and time-consuming.

In the Majority's view, the City's passage of the 2023 Ordinance obviated its legal interest in the outcome of its appeal regarding the 2015 Ordinance.[28] And it is true that the 2023 Ordinance expressly acts as a repealer of all that went before—necessarily including the ordinance here at issue.[29] Furthermore, we cannot put much stock in the City's claims that it would enforce the 2015 Ordinance given the opportunity; it seems clear that no matter what our ruling, the 2015 Ordinance no longer exists to *be* enforced. Similarly speculative is the City's alternative suggestion that, upon a favorable ruling, it would reenact in substance the 2015 Ordinance. City Council and the Mayor's office are

---

[28]    Maj. Order, 6/18/2024, at 2 (*per curiam*) ("[T]he City now seeks merely an advisory opinion . . . .").

[29]    *See* 2023 Ordinance § 781.11 ("All resolutions, ordinances, or parts thereof in conflict in whole or in part with any of the provisions of this Chapter are, to the extent of such conflict, hereby repealed.").

differently composed than they were in 2015, and any speculation about what precisely might happen is an inappropriate consideration for this Court.

But that doesn't change the fact that the City enacted the 2023 Ordinance under the prospect of having no ordinance at all if, as happened, the Commonwealth Court ruled against it, and this Court either denied allowance of appeal or affirmed the Commonwealth Court's ruling (or, as it now does, granted allowance of appeal only to dismiss it later, leaving the Commonwealth Court's decision undisturbed). It also does not change the fact that the business exclusion's effect on rental market regulation applies equally to every home-rule municipality in the Commonwealth. For that reason, the Commonwealth Court's sweeping precedential decision on this novel question severely hamstrings the ability of governments selected by hundreds of thousands if not millions of Pennsylvanians to exercise a classically recognized function of the common-law and statutory police power. Today, the Court indicates that it will not review this new rule unless and until a municipality decides to enact something that brings the question to the fore and stays the course against adverse rulings in the face of the tangible risk that it will lose *all* regulation of residential leasing, accepting that it will be forced to scramble to replace the invalidated legislation[30] should that occur.[31]

---

[30] Despite its relatively anodyne form, it took Pittsburgh City Council seventeen months to enact the 2023 Ordinance.

[31] The availability of the choice to do exactly that arguably means that this is *not* a case in which the question presented will recurrently evade review, *e.g.*, because the timeframes involved are simply too short. And, as noted, there are jurisdictions where the equivalent of the public-importance exception to mootness is entangled with that criterion such that review might, in fact, be barred here. *See, e.g., Young*, 502 P.3d at 970-71; *Jackson Cty Bd of Election Comm'rs*, 277 S.W.3d at 745. But this Court and our intermediate appellate courts have always recognized the public-importance exception to mootness as distinct from the capable of repetition and evading review (continued…)

To be sure, there is a risk inherent in applying the public-importance exception too liberally. Prudential matters are by their nature discretionary, and where there is discretion there is an invitation to imprecision, even arbitrariness. Our cases have done little to prevent this, and it may be for that reason that this Court and the lower courts so seldom invoke the exception. To my thinking, though, the answer lies not in neglecting to apply an exception we continue to claim exists, but rather in examining how we might confine the inquiry to maximize consistency while minimizing overuse, providing guidance to the lower courts in whether and when to overlook mootness in service of the common good.[32]

As noted, the Tennessee factors all militate in favor of our application of the public-importance exception. Further urging our review is the fact that the Commonwealth Court's decision in this case is the law of the land, and presumably won't change any time

---

exception, and even where they are related, it tends to be based more on the assurance that the issue will recur in the sense that the question can be counted on to arise elsewhere than it is based on its persistent ability to evade review in the long run.

[32] Closely related to the judicial reluctance to issue advisory opinions where they will not advance the interest of any one party is concern for the speculation inherent in assuming any particular issue will recur. The reality, though, is that there are no mootness exceptions without some degree of speculation. Where the immediate parties have no stake in the outcome, it is inherently speculative that any other parties ever will have occasion to care about the outcome. The persistence of mootness exceptions reinforces the proposition that speculation is not always to be abhorred, especially when the question involves the scope of official power. The New Jersey Supreme Court has spoken aptly on this issue. *See Busik v. Levine*, 307 A.2d 571, (N.J. 1973) ("[T]here is no constitutional mandate that a court may not go beyond what is necessary to decide a case at hand. Whether an issue will be dealt with narrowly or expansively calls for a judge's evaluation of many things, including the need for guidance for the bar or agencies of government or the general public. To that end, the Court may . . . itself raise an issue it thinks should be resolved in the public interest . . . . [A] court may decide an issue even though the litigation has become moot, again in the public interest."). And the *Norma Faye Pyles* Court also spoke to this when it established the likelihood of recurrence as a factor for consideration without requiring that the dispute involve the same parties.

soon.[33]  It governs scores of home rule municipalities with an exceedingly broad account of the business exclusion that patently is in tension with this Court's decision in *PRLA*.[34] And it calls into question the continuing validity of the Commonwealth Court's own case law approving residential rental regulations.[35]  In short, the lower court opinion in this case appears to depart from prior decisions, including our own, a factor that alone urges our

---

[33]     Other courts have cited the precedential effect of lower-court decisions as reason to overlook mootness in the public interest.  *See, e.g., Commonwealth of Mass. v. Klaus*, 145 N.Y.S. 713, 715 (NY App. Div. 1911) ("We should deem it our duty to examine the question of the validity of the act because the Special Term decision . . . will, unless overruled, probably serve to render the act nugatory.  Appellate courts not infrequently pass upon questions affecting important public interests, even where in the particular case the question has become academic.").

[34]     In *PRLA*, we held that a city ordinance requiring employers in the city to provide paid sick leave was authorized by the Disease Prevention and Control Law, arguably a statute more attenuated from the ordinance enacted pursuant to its authority than the MHOA is from all or most of the provisions of the City's 2015 Ordinance.

[35]     *See Berwick Area Landlord Ass'n*, 48 A.3d 524; *McSwain*, 520 A.2d 527.

review.[36]  Home-rule municipalities deserve greater clarity, especially with respect to a topic as critical to health and safety as the regulation of residential housing.[37]

---

[36]     Nor are these the only problems with the Commonwealth Court's decision. Unacknowledged by the Commonwealth Court in this case, the 2015 Ordinance contained a severability clause, reflecting City Council's intention that, should any part of the Ordinance offend constitutional or statutory restrictions, only that part should be stricken, the rest remaining in effect.  *See* 2015 Ordinance § 781.10 ("This Chapter and the various parts, sections, subsection, sentences, phrases and clauses thereof are hereby declared to be severable.  If any part, section, subsection, sentence, phrase or clause is adjudged unconstitutional or invalid by a court of competent jurisdiction, the remainder of the Chapter shall not be affected thereby.").  Although the Commonwealth Court highlighted certain specific concerns with the 2015 Ordinance, it did not perform— or even acknowledge the prospect of—a severability analysis pursuant to which it might have stricken specific regulatory measures it found impermissible while retaining others. *Cf.* 1 Pa.C.S. § 1925 (providing that "[t]he provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby" unless, speaking generally, severance would compromise overarching legislative intent or leave an incomplete enactment); *Pap's A.M. v. City of Erie*, 719 A.2d 273, 280-81 (Pa. 1998) (applying Section 1925 principles to an unconstitutional ordinance), *rev'd on other grounds sub nom City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000).  And in declining to salvage *any* of its provisions, including some that have been found consistent with home rule in the past, *see Berwick Area Landlord Ass'n*, 48 A.3d 524 (upholding landlord registration ordinance); *McSwain*, 520 A.2d 527 (upholding ordinance requiring housing code inspection), it did so in a way that suggested that virtually *any* future effort by a home-rule municipality to regulate its rental market would be deemed to offend the business exclusion.

[37]     *See Wise v. First Nat. Bank of Nogales*, 65 P.2d 1154, 1156 (Ariz. 1937) (overlooking mootness because of risk of annual litigation and interest of "almost every incorporated city and town" in the outcome); *Leak v. High Point City Council*, 213 S.E.2d 386, 389 (N.C. Ct. App. 1975) ("This [technically moot] case involves the right of city councils to investigate the affairs of the city . . . .  The statutes were enacted in the 1971 Session of the General Assembly.  The case is the first involving this enactment to reach us, and the determination of the issues involved is of public interest, unquestionably beneficial to the municipalities as a guide in the exercise of the investigative authority delegated by the legislature"); *Scripps Media Inc. v. Tenn. Dept. of Mental Health & Substance Abuse Servs.*, 614 S.W.3d 700, 706 (Tenn. Ct. App. 2019) (applying public-interest exception regarding moot issue relating to scrutiny of public records because "[t]here are bound to be similar occurrences in the future").

It is clear that this Court has been reluctant to apply the public-importance mootness exception. But this Court's obligation to pass on important questions of official authority, and in particular the interaction between state law and local prerogatives, should not be held hostage to the inescapable exigencies of uninterrupted governance. Nor should we be blind to the precedential value of decisions made in the context of specific cases, the parties to which may not be directly affected relative to the original controversy. The lack of direct effect is not the same as no effect at all. Here, for example, there is no telling what Pittsburgh City Council, or the legislature of any other political home-rule municipality, might do were we to vindicate the authority Pittsburgh City Council attempted to exercise in 2015. What *is* certain is that Pittsburgh officials and home-rule officials across the Commonwealth would have a far more nuanced understanding of what options are available to them. There is great value in that, and it is for precisely that reason that other courts more liberally apply the public-importance exception in similar cases. I would have this Court join them. Accordingly, I respectfully dissent.

Justice Donohue joins this dissenting statement.